Statement of the Case.
MONROE, J.
Defendant has appealed from a judgment condemning it to pay $22,-500 as damages for the conversion of the timber on school section 16, township 15 S., range 14 E., in the parish of Assumption, and the state has answered the appeal, praying that the amount of the award be increased to $50,000.
It appears from the evidence that for many years the timber on the section in question has been the subject of depredations; that the school board ordered an investigation, and received a report to that effect in 1887-1889; that between the year last mentioned and 'December 8, 1899, the board entered into contracts whereby different individuals were authorized to deaden, cut, and remove timber upon payment of prices agreed on, and that a large proportion of the timber was deadened and a good deal removed under said contracts; that on December 8, 1899, the board entered into a contract with F. B. Williams, whereby, in consideration of the sum of $2,200 paid in *65 cash, he was authorized to “cut and pull all the cypress stumpage” on said land; that the defendant is a company of which said Williams is president, of the capital stock of which he owns 90 per cent, or more, to which he is said to have assigned his rights under said contract, and which has cut and pulled said remaining cypress stumpage.
The witnesses differ somewhat as to the quantity of timber so remaining. Waities, civil engineer and estimator, called by plaintiff, made an estimate, early in 1910, by measuring the stumps, considering the appearance of the bark and general condition, and averaging the trees with those on the adjoining sections, and he places the amount originally on the tract at 13,500,000 feet, of which 2,688,000 feet he thinks had been removed a long time before, and 10,880,000 feet had been removed within the two or three years preceding his inspection, there being testimony other than his to the effect that his method of estimating was fairly accurate. Nuttall, civil engineer and estimator, called by defendant, made an estimate in 1906, just before of about the time that defendant began cutting, and places the original quantity at 12,000,000 feet, and says that 6,000,000 feet were still there, including some 3,000 trees which had been deadened.
Mr. F. B'. Williams estimates the quantity actually removed at “about” 5,000,000 feet, and Mr. Eaultman, foreman of the pull boat, testifies that he pulled 17,000 trees, averaging 370 or 365 feet, of which 3,000 previously deadened would have averaged between 500 and 600 feet, if they had been floated before they became sap rotted, but upon which, as appears from other testimony, there may have been a loss of 25 per cent.
It therefore appears that the witness himself deadened and pulled 5,145,000 feet, and that he pulled trees previously deadened which should have yielded (after deducting 25%) 1,237,500 feet, making a total of 6,382,-500 feet. 1-Ie further testifies that he pulled some trees from other sections, and that he was unable to say exactly how much from section 16, but that the account had been kept by the bookkeeper; in fact, his' testimony was based upon his recollection of figures which had been given to him by the bookkeeper several years before, but the bookkeeper was not called as a witness. Upon the whole, we are of opinion that defendant may reasonably be charged with 6,000,000 feet. As to the value, the evidence shows that from some years prior to 1906 and up to the date of the trial such timber had been worth $6 per M., on the stump, so that the 6,000,000 feet were worth $36,000 in that condition. The same timber manufactured into lumber was worth $23 per M., or a total of $138,000. It appears from the testimony of Mr. Williams that 3,200,000 feet of it were converted into sawed cross-ties, which he was holding at 45 cents each, and, as there are 32 feet in each tie, and hence 31% ties in each 1,000 feet, that price would represent $14.06% per M., and a total of $45,000 as the value of the timber in that form, and with the remaining 2,800,000 feet manufactured into lumber, at $23 per' M., an aggregate value for the whole of $109,400.
The cost of manufacturing and yarding such lumber is shown to be about $12 per M., though, where cross-ties and lumber are produced from the same logs, the expense attributable to the ties is not so great, and, in fact, the profit on the lumber may more than pay the expense of manufacturing the ties.
Assuming, however, that the expense is the same, whether for lumber or ties, and we have:
Total value of 6,000,000 feet, manufactured into cross-ties and lumber, as heretofore stated....... $109,400 00
Total cost of logging and manufacture @ $12 per M............ 72,000 00
Balance of profit............$ 28,400 00
*67 Opinion.
[1] The section 16, from which the timber in question was taken, is a section “in place,” which was acquired by the state, by donation from the United States, on condition that it, or the proceeds thereof, in the event of its being sold, be held, or invested, by the state, for the use and benefit of the public schools. The law provides that such a section may be sold after the sense of the inhabitants of the township in which it is situated shall have been taken and a majority of the legal voters shall have expressed themselves as in favor of such sale, “but not otherwise”; that the sale shall then be made, upon the order of the State Auditor, by the parish treasurer, or sheriff, at public auction, to the highest bidder in quantities not less than 40 or more than 160 acres after appraisement and 30 days advertisement, and in no case for less than the appraised value, the terms of sale to be one-tenth cash and the balance in nine installments, payable annually and represented by notes bearing interest at 8 per cent., the cash to be paid to the State Treasurer, and the notes, made payable to the Treasurer, to be placed in the office of the Auditor for collection; and all cash so realized by the State Treasurer to be invested, as provided by the act of Congress approved February 15, 1843 (Act Feb. 15, 1843, c. 33, 5 Stat. 600), and section 2958 of the Revised Statutes of the state. Act 321 of 1855 (R. S. 2957), the Constitution of 1868 (article 139), the Constitution of 1879 (article 233), and the Constitution of 1898 (article 257), all contain provisions to the effect that such fund shall be—
“held by the state as a loan, and shall be and remain a perpetual fund, on which the state shall pay an annual interest, * * * and that said interest shall be paid to the several townships in the state entitled to the same.”
In State ex rel. Durant v. Board of Liquidation, 29 La. Ann. 77, it was held (quoting the syllabus):
“The act of the Legislature No. 81 of the year 1872, which abolished the free school fund, and ordered the bonds composing that fund to be sold by the Auditor and Treasurer of the state, is unconstitutional, and no property in any of these bonds has been acquired by any purchaser of the bonds who may have bought them at a sale made under said act No. 81.”
In Board of School Directors of Concordia v. Ober, 32 La. Ann. 419, it was said (referring to a sectio'n similar to that here in question):
“The title to this land has never been in the parish board of school directors. The title was in the state, under the donation of the general government, and she held it for a specific purpose, with authority to sell the lands and a mandate to hold the proceeds and invest them for the benefit of the schools. No doubt she could confer authority on the parish boards of directors to sue in her stead [for the recovery of such lands], but she has not done it; on the contrary, the state has seemed very tenacious of this power, and we think rightly, considering the position of trustee in which she stands to this fund.”
In Telle et al. v. School Board et al., 44 La. Ann. 365, 10 South. 801, it was held that the voters of the township have a standing to sue for the nullity of the sale of a sixteenth section, and that, the conditions required for such sale not having been complied with, no title passes to the adjudicatee, even though the price had been paid into the state treasury.
In State ex rel. Hopkins v. Stark, 111 La. 595, 35 South. 760, it was said, concerning an attempted sale by a school board of the timber on a sixteenth section:
“To hold that a parish school board has implied power to sell, at private sale or otherwise, all the timber on the section, constituting, in this and other cases, almost the entire value of the tract, would be to nullify the statutes.”
The sale to F. B. Williams under which defendant claims was therefore absolutely and incurably null, and conveyed no title whatever; and, Williams having no title, conveyed none to defendant. Nor does the fact that defendant acquired such title as it sets up from Williams affect the question of its good or bad faith.
*69 [2] It is unnecessary to inquire here whether any third person or corporation, claiming under a title from Williams, could be held to have acquired the status of a purchaser in good faith, since Williams’ title shows upon its face that the attempted sale to him was made by a body not authorized to sell in violation of a prohibitory law. As the matter stands, however, Williams, having merely turned over the property to a corporation, evidently organized by himself, for his own purposes, of which he became president, and in which he owned 90 per cent, or more of the-stock, his knowledge, or presumed knowledge, of the character of his title, must be imputed to the corporation. We may add, in that connection, that whilst the members of the school board and Williams, alike, acted under a misapprehension of very plain provisions of law, the evidence leaves no doubt that they did act under such misapprehension, and morally in good faith. We are compelled, however, to apply the maxim, “Ignorantia juris non excusat,” and to hold that defendant, being bound to know the law, must be considered to have converted the timber in question to its own use, knowing that it had no title thereto, and hence to have been in legal contemplation a possessor in bad faith. The fact is, whilst it is shown that the defendant company, through its agents, cut and pulled the timber which is the subject of this litigation, and whilst the written instrument, whereby the school board sold to Williams the right to cut the timber, is' in the record, no evidence was adduced in support of defendant’s allegation that it had purchased the right from Williams. Eor the reasons which have been stated, however, that makes no difference, as, in any event, the knowledge of Williams must be imputed to the defendant.
"One who, well acquainted with the facts, but in error as to the law, has taken possession of property belonging to another, is a possessor in bad faith.” McDade v. Bossier Levee Board, 109 La. 627, 33 South. 628.
In Eastman v. Harris, 4 La. Ann. 193, defendant found and appropriated a raft which was stranded upon his land, and, having cut it up into firewood which he sold for a price exceeding, after deducting the cost of cutting it up, the value of the timber in its original condition, he was held to have been a possessor in bad faith, and, as such, liable for the value of the timber, as thus converted into firewood, after deducting the cost of cutting it up. In the course of the opinion, Slidell, J., as the organ of the court, said:
“Even where a person, in good faith, has employed materials which did not belong to him in making another article, the owner of the materials has a right to claim the thing made out of them on reimbursing the price of the workmanship. There is an exception, where the workmanship is so important that it greatly surpasses the value of the materials, as in the case of a statue which the statuary has made from a block of marble. * * * But, if such would be the rights of the owner against a possessor in good faith, unquestionably the possessor in bad faith cannot complain if the thing is taken from him upon reimbursing to him the price of his labor. Such a possessor cannot be permitted to profit by his wrong. See Civil Code, 524 (532), 2292 (2314). Whatever in a mere moral point of view may be defendant’s freedom from blame, it is clear that in a legal aspect he was a possessor in bad faith.”
[3] In cases where the defendants have been found to have converted the property of others in bad faith, moral as well as legal, they have been condemned for the value of the property, in its changed condition, with no deduction whatever of the cost incurred in making the change. Wooden Ware Co. v. U. S., 106 U. S. 432, 1 Sup. Ct. 398, 27 L. Ed. 230; Trust & Safe Deposit Co. v. Investment Co. et al., 107 La. 251, 31 South. 736; St. Paul v. Louisiana Cypress Co., 116 La. 585, 40 South. 906. In the instant case, as in the case of Eastman v. Harris, supra, the ends of justice are subserved by holding that the owner is entitled to the profit resulting from the change made in the form or condi *71 tion of the property by the possessor in legal bad faith, and that the latter cannot reasonably expect anything more than the reimbursement of the expense incurred in making the change. Defendant’s counsel urge the plea of the prescription of one year as against an action in tort; and by way of answer to the proposition that the Constitution, which was in force when Williams made his supposed purchase from the school board, provides that: “Art. 193. Prescription shall not run against the state in any civil matter, unless otherwise provided in this Constitution, or expressly by law” — the counsel say that this suit was brought under Act No. 158 of 1910, which was passed after the alleged tort had been committed; that, under said act, the school boards are authorized to sue, and the state does not itself sue; and that in any event the state, as trustee, is not protected by a prescription intended to protect it in its sovereign capacity.
The act referred to does authorize the school boards to bring suits for damages resulting from trespass on sixteenth sections, and for the recovery of such sections, but it does so in the capacity of a principal authorizing an agent to sue in his behalf. The school boards are authorized “to recover for the state” for trespass on lands “the title to which is still in the state”; the attorneys employed by the school boards being required to “work in conjunction” with the district attorneys, in the respective parishes where the suits are brought, the suits being required to be brought in the name of the state, and each amount recovered, after deducting attorney’s fees and costs, being required to be paid into the state treasury, “to the credit of the township in which the land is situated, in the same manner as is now provided by law for the proceeds of the sale of such sixteenth sections.”
[4] We do not find that the act thus quoted changes the attitude or obligations of the state with respect to school lands, save in the respect, which is unimportant, that it contemplates that the school boards which are nearer to and more directly interested in the sixteenth sections in their respective parishes shall aid the state in the execution of her trust. The proposition that the rule of prescription established by the Constitution does not apply to the state in her capacity as trustee is untenable. Everything that the state holds in her capacity as sovereign she holds as trustee; and, if the rule in question does not apply for the protection of land donated and held in trust for the public schools, it does not apply to the beds of navigable streams and tide water, which are also held in trust.
[5] Defendant prayed that the members of the school board by whom the supposed sale to it was authorized be called in warranty, but, on exception, its demand in that respect was dismissed, and in the final judgment the right, if any it has, was reserved to it, to recover from the school board. We are of opinion that the ruling was correct. Defendant’s author dealt with the school board as a legal entity, and not with its members, as individuals, and, he and the board having the same opportunity for obtaining information concerning the legality of their proposed action, the board, as such, undertook to sell him the timber, and the board, as such, received the price and devoted it to the use of the public schools. The members of the board having derived no profit to themselves in the matter, there is no basis upon which they can be held liable personally for their official action. Marshall on Corporations, par. 371, p. 1003.
It is therefore ordered, adjudged, and decreed that the judgment appealed from be amended by increasing the principal amount of the award in favor of plaintiff from $22,-500 to $28,400, the interest to remain unchanged, and, as thus amended, affirmed, at the cost of the defendant in both courts.