## ROSS, GOVERNOR ET AL. v. TRUSTEES OF UNIVERSITY

(No. 1172, August 26th, 1924; 228 Pac. 642.)

HIGHWAYS—POWER TO ESTABLISH—PUBLIC LANDS—EASEMENTS FOR PUBLIC ROAD—CONGRESSIONAL GRANTS—CONSTITUTIONAL LAW— STATUTES—STATE LANDS—STATE LAND COMMISSIONERS—UNIVERSITY TRUSTEES.

1. The power to establish highways resides primarily in the state, to be exercised under legislative authority, subject to constitutional restrictions.
2. A county or town, authorized by the Legislature to establish highways, acts as a political agent of the state.
3. Comp. St. 1920, § 746, authorizing the state board of land commissioners to grant right of way for roads across state lands, *held* to authorize an easement only over such lands.
4. Land board's certificate to county board of commissioners, made pursuant to Comp. St. 1920, § 746, dealing with land granted to the state for university purposes, entitled ''grant of easement for public highway,'' and providing that a discontinuance of the use of the described tract as a public highway shall terminate grantee's right, *held* to grant an easement only.
5. A county, in applying for and acquiring right of way as county road over state lands from state board of land commissioners, under Comp. St. 1920, § 746, 'acted in the capacity of a political or administrative agent of the state, and whatever title it acquired to the easement is held for the state, and solely for designated purpose, sub-

ject to the same legislative control as though the road had been declared to be a state instead of a county road.

6. The general provisions of congressional granting acts and the state Constitution, limiting or conditioning the sale and disposal of lands granted to the state for university purposes, should be reasonably construed, in view of objects of grant, and purpose of restrictions.

7. Unless the purpose of grant of lands to the state for university purposes is substantially impaired by a grant of right of way for county or public road across such lands, neither state's act making grant nor statute authorizing it, (Comp. St. 1920, § 746), should be held a violation of the trust upon which the lands are held, or of the constitutional restrictions upon their disposal.

8. In a suit by university trustees against the state land board to have declared void county road granted to county board over state land held in trust for university purposes, a general averment that grant has caused the University great and permanent injury and loss *held* insufficient to show an actual and substantial loss to trust property.

9. Constitutions or statutes are to be construed as a whole in order to ascertain their intent and general purpose, and also the meaning of each part.

10. The state, which holds title to certain state lands in trust for the University, cannot surrender its responsibility by transfer of granted lands to the University, an institution of its own creation, and over which it is required, by the very terms of the grant, to retain exclusive control.

11. The state must act through its legislative power in administering a trust, or in creating and appointing agents or officers to perform the duties thereof.

12. The University, though declared by statute to be a body corporate by specified name, is not separate from or independent of the state, but is so much a dependent part of it that, even upon a vesting of title in it of public lands of a state, the lands would still remain lands of the state.

13. Control and disposition of lands granted to the state, for university purposes, by Act Cong. Feb. 18, 1881, *held* to lie in state board of land commissioners, within Comp. St. 1920, § 746, in trust for purposes expressed in grant, rather than in university board of trustees, in view of Const. art. 18, §§ 1-4, 13, and Act of Admission (Act Cong. July 10, 1890), § 8, and of Act Cong. Aug. 9, 1888,

relative to authorizing leasing of granted university lands, and Territorial Act March 14, 1890 (Laws 1890, c. 84), despite Const. art. 7, § 15, which "vests" such lands in the University, and section 17 of same article, which authorizes the Legislature to provide for the management of the University, "its lands and other property," by a board of trustees; the word "vest," wherever found, to be construed, with reference to subject-matter, reasonably to carry out intention fairly to be gathered from instrument wherein it is found.

14.   Const. art. 7, § 17, providing for the management of the University, "its lands" and other property, by board of trustees, etc., *held* not to confer on trustees power of disposition over lands granted by Congress to state for university purpose; the words "its lands" applying only to lands acquired for the University, held in its corporate name or otherwise, to be occupied and used as lands in the ordinary conduct of the university affairs.

Error to District Court, Albany County; Volney J. Tidball, Judge.

On petition for rehearing. For former opinion, see 30 Wyo. 433; 222 Pac. 3.

*David J. Howell*, Attorney General, for plaintiffs in error; *Ray E. Lee*, of counsel.

*Corthell, McCullough & Corthell*, for defendant in error.

Potter, Chief Justice.

The case is now before us upon a petition for rehearing, alleging that, by the decision upon the original hearing (see 222 Pac. 3), this court erred in the following particulars:

"1.   In holding that the grant of lands in controversy for County road purposes is justifiable under the power of Eminent Domain.

2.   In holding that the State Board of Land Commissioners and not the Trustees of the University has the management of University lands.

3. In holding that the University lands are not vested in the University under Section 15 of Article VII of the Constitution.''

The court did not, by said decision, hold either of the above propositions as they are stated. But we think we understand what was intended in so stating the grounds for rehearing, and as we desire the court's position to be accurately understood, we feel justified in briefly explaining the distinction between that position and what the court seems to be represented to have held in the above statement of the grounds for rehearing.

When discussing the provision of the statute for granting a right of way for county roads over state public lands, we said that the taking of such lands by the exercise of the right of eminent domain has usually been upheld by decisions upon the subject, where the fee is not thereby disposed of, and cases were cited in support of that statement; but it was further said in that connection that eminent domain, when defined as the power to take private property for public uses, was not involved in the case; and, argumentatively, that if, in the exercise of such power, the state might permit corporations and individuals to acquire the right to use such lands for quasi-public purposes, it was difficult to see why the state itself might not consent to such use for a purely public purpose, especially where such use would not defeat the objects of the grant. But the question of the right to acquire such lands through eminent domain was left undecided and for the reason stated, that it was not a question in the case.

Instead of holding that the Land Board and not the University Board has the management of university lands, we held that the provision relied on by the University (Sec. 17 of Art. VII) directing the legislature to provide for the management of the University ''its lands and other property'' by a board of trustees was not intended to affect the

management and control of *state lands* like those involved in this case, and we said:

"We think it is not a strained construction to say that the lands and other property of the University, *as there mentioned,* does not include lands held by the state for university purposes, under this grant. As to these state lands, the University's interest is that of a beneficiary, and its right is, not to have the lands, but only the income therefrom."

Our decision thus left the University Trustees in the management of all its real and personal property "occupied or used by, and in connection with, that institution, and perhaps, other property, not necessary now to be inquired about."

Again, instead of holding, as stated in the third ground aforesaid, that "the University lands" are not vested in the University by section 15 of Article VII, we held, construing *that* section, that the declaration therein that the lands granted to the University as such or in aid of the instruction in any of its departments, should vest in the University, was not intended to take the lands in controversy "out of the category of state lands, where they were placed, not only by the terms of the grant, but by its acceptance through the constitution, and by other provisions of that instrument." Moreover, said third ground contains a technical misstatement of the situation by referring to the granted lands as "*the* University lands," since it is generally held, and it is conceded in this case, that the title to all of the lands under the grant in question was and remains in the State. It was, no doubt, intended by the language used in stating that ground to refer merely to the lands in question in this case, and we shall consider it as alleging error in the holding that the lands granted to the state under the Congressional acts involved in the case were not "vested" in the University except as the beneficiary of their proceeds. The opinion recites the fact that no university had been

established when the grant was made to the Territory, that when the Constitution was framed and adopted the lands had not been granted to the University as such, nor in aid of the instruction to be given in that particular institution, and that the original grant was for the use and support of a University when the Territory should be admitted as a state. Reciting the further fact, in the original opinion, that the use of the income for its support was all the benefit that any university could expect to receive from the fund, we held that the provision of the Constitution vesting in the University all lands granted by Congress into the University as such or in aid of the instruction given in any of its departments, if including these particular lands, merely designates the University as the institution to receive the benefit of the grant, and that it was not intended thereby that the lands themselves should become university lands within the meaning of the provision in the same article for the management of its lands and other property by a board of trustees.

In the brief filed in support of the application for rehearing, the first point presented involves a criticism of the court's decision for having considered the right to acquire, by proceedings in eminent domain, a right of way for a highway across these or other public lands of the state granted to it by Congress, and it is suggested that the question which, it is said, was not presented in the briefs upon the original hearing, is of such importance that it should not be disposed of without a full and exhaustive presentation of both sides and the fullest consideration by the court; and it is now suggested that if the question is believed by the court to be necessarily involved, an opportunity be afforded counsel for each of the parties to prepare briefs and present their views thereon. The court's decision seems also to be somewhat criticized for having considered the question of the right of the state by legislative authority, through the land board or otherwise, to grant an easement for a county road across lands embraced within the Con-

gressional grant aforesaid, either with or without compensation; that seeming to be based also upon the ground that a decision of the question was not necessary to a disposition of the case upon a consideration of the question whether the University Board or the Land Board has the management of said lands.

It is true that the argument upon the original hearing was confined to a discussion of the latter question. But it was suggested in the brief for the University upon that hearing that the decree of the district court should be affirmed, and it was stated in concluding the argument in that brief that the authorities cited would seem to be pertinent also on the question whether *either Board* could lawfully make the grant in question. And it was said further in the brief concerning that matter, that whether exercised by the one board or the other, the attempt to make the grant "would seem to be a plain violation both of the constitutional provisions and of the provisions of the granting Act." But it was suggested that the question might not be essential to the determination of the case.

Our statement above explaining the reference in the former opinion to the decisions respecting the right to acquire through eminent domain an easement across public lands sufficiently answers, we think, the criticism as to the court's consideration of that matter as well as the suggestion that the parties be allowed an opportunity to present their views upon it. But to remove any remaining doubt as to the effect of the decision in that respect, it may be understood that the court did not then and does not now decisively pass upon the question, but leaves it open for further consideration whenever properly presented.

It seemed, necessary however, to consider the question of the right of the legislature to authorize the granting of a right of way for a county or public road across such lands, in view of our conclusion that the judgment could not be affirmed upon considering alone the authority of the land board in the matter of the control, leasing and disposal of

such lands. Without considering the power of the legislature to authorize or the state to grant a right of way across such lands for the purpose aforesaid, the judgment here for review might possibly have been modified in a particular which would seem necessary in any event, if not reversed. But it was not thought reasonably possible to reverse the judgment, as was contended should be done by counsel for the land board, without a determination of its authority under the statute providing for the granting of said right of way. And it is not now perceived that a decision of that question could be reasonably avoided, in view not only of the court's said conclusion, but the issues in the case and the terms of the judgment complained of.

The case was disposed of below upon a demurrer to the petition. The prayer of the petition is that the right, title and interest of the university trustees in and to the described lands be quieted and established; that the state land board and Albany county, the defendants named in the action be adjudged to have no interest, right or title in or to or authority over said lands; and that each of them be enjoined from assuming or exercising any power of disposal over them, and especially from establishing or constructing the public road described in the petition. And the judgment appealed from grants the entire relief as prayed for.

While the brief for the university upon the original hearing stated in its first paragraph that the case had been selected from a variety of instances involving the general question whether the Land Board or the Trustees of the University have the management of the university lands, it concluded the discussion of that question by what has been above quoted denying the right of either board to grant the right of way in question, and then by saying:

"It is, therefore, submitted that the district court was right in deciding that the control of the University lands lies in the University board, rather than in the Land board;

and that the former board is entitled to the decree restraining interference by the land board, and restraining the attempted diversion of the land grant from university purposes to highway purposes assumed to be authorized by the legislative act invoked. In this view the decree of the district court should be affirmed.''

Thus, while confining the discussion in the cause to the one point, an affirmance of the judgment was insisted upon, not only for the purpose of deciding that point, but also to establish the correctness of the judgment restraining operations under the grant of a right of way for a county road, alleged to be an attempted diversion of the land from university purposes. The court would have welcomed an opportunity to avoid deciding that question, if for no other reason than its inclination to confine a decision to questions necessary to a disposition of the cause. But the opportunity did not then and does not now seem to be presented.

The selection of this case for the purpose of having determined the single question as to which of the two boards aforesaid have the management of said university lands does not appear to have been a happy one. For the transaction is certainly not one of lease, and it is at least doubtful if it involves a sale, or any other transaction than such as might be conducted, under legislative authority, by any state board or public agency, assuming that the State might, under any condition, grant the right of way in question. The case is unique in this: The land still remains public, although temporary control has been transferred to the county as an administrative agency of the state in the establishment, construction and maintenance of its public highways; and the suit, while brought against a state board, questions not only the authority of that board to act in the matter complained of, but the power of the state itself, through its legislature, to authorize such action at all, on the asserted ground that it involves a violation of the trust imposed by the Congressional grant of the lands to the

state. It is indeed suggested by counsel, as above quoted, that neither board could properly act in the matter. If that be so it is difficult to see where or how the question necessarily arises concerning the respective rights of the two boards as between themselves. But the court, regardless of that situation, considered and decided the question presented by the briefs and argument; both parties having urged a decision to settle the controversy aforesaid existing between the two boards for several years. And having, under such circumstances, considered and decided the question, we shall allow the decision to stand in the absence of some sustained ground for a rehearing. Indeed counsel does not complain of the fact that the court *did decide that* question, but only, in that connection, that the court erred in its conclusion.

It is not our purpose at this time to enlarge upon the discussion in the former opinion, of the right of the state under proper legislative authority to grant a right of way for a county or public road across lands included within the grant aforesaid, further than to call attention to some additional authorities. We desire, first, to cite the case of U. S. vs. The Railroad Bridge Company, 6 McLean 517, Fed. Cas. No. 16, 114, decided in the Circuit Court for the Northern District of Illinois in 1855, and to quote from the opinion therein of Mr. Justice McLean, then an associate justice of the Supreme Court of the United States. In disposing of the question there involved concerning a right of way across certain public lands of the United States which, at one time at least, had been reserved for military purposes, the learned justice said:

"The proprietorship of land in a State by the general government, cannot, it would seem, enlarge its sovereignty or restrict the sovereignty of the State. This sovereignty extends to the State limits over the territory of the State, subject only to the proprietary right of the lands owned by the federal government, and the right to dispose of such

lands and protect them, under such regulations as it may deem proper. The State organizes its territory into counties and townships, and regulates its process throughout its limits. And in the discharge of the ordinary functions of sovereignty, a State has a right to provide for intercourse between the citizens, commercial and otherwise, in every part of the State, by the establishment of easements, whether they may be common roads, turnpike, plank or railroads. The kind of easement must depend upon the discretion of the legislature. And this power extends as well over the lands owned by the United States, as to those owned by individuals. This power, it is believed, has been exercised by all the States in which the public lands have been situated. It is a power which belongs to the State, and the exercise of which is essential to the prosperity and advancement of the country. State and county roads have been established and constructed over the public lands in a State under the laws of the State, without any doubt of its power, and with the acquiesence of the federal government. * * * These easements have so manifestly conduced to the public interest, that no objection, from any quarter, has hitherto been made. And it is believed that this power belongs to the States. It is difficult to perceive on what principle the mere ownership of land by the general government within a State, should prohibit the exercise of the sovereign power of the State in so important a matter as the easements named. In no point of view are these improvements prejudicial to the general interest; on the contrary, they greatly promote it. They encourage population, and increase the value of land. In no respect is the exercise of this power by the State inconsistent with a fair construction of the constitutional power of Congress over the public lands. It does not interfere with the disposition of the lands, and instead of lessening enhances their value. * * * Whether we look to principle, or the structure of the Federal and State governments, or the uniform practice of the new States, there would seem to be no doubt that

a State has the power to construct a public road through the public lands. A grant to this effect is sometimes made by Congress, as in the act of 1852; but this does not show the necessity of such a grant.''

Referring to a contention in Minnesota that a statute granting a right of way to railroad companies, upon certain stated conditions and terms, over any school or university lands held by the state, was repugnant to a constitutional provision forbidding the sale of school lands except by public auction, the Supreme Court of that state, in Lawver v. Great Northern R. Co., 112 Minn. 46, 127 N. W. 431, said:

''We doubt the soundness of this contention. The constitutional provision was intended to prevent the secret sale and possible sacrifice for an inadequate price of that portion of the public domain granted to the state for educational purposes. The construction of the railroad across such lands would not only bring them into the market, but add materially to their market value. The sale of a right of way by auction would necessarily be farcical or afford a means of preventing a public improvement. In interpreting a constitutional provision, a court is required to use common sense and place upon it a practical construction, as fully as when construing a legislative enactment.''

In that case also the court said that if the statute had contained an unconditional grant in praesenti to the railroad company of a right of way over the land, or made such grant solely upon condition of the location and construction of the road thereon, the defendant had, by the location and construction of its road, obtained the easement contended for. But, because of the conditions and terms mentioned in the statute, it was held that the railroad could not acquire the right of way as against the state until performance of the required conditions.

The power to establish highways resides primarily in the state, to be exercised under legislative authority, subject of course to constitutional restrictions. 29 C. J. 339; Elliott on Roads & Streets, Sec. 421; Commonwealth v. McNaugher, 131 Pa. St. 55, 18 Atl. 934. And where the legislature has imposed the duty of establishing highways upon a county or town, such county or town acts as the political agent of the state. 29 C. J. 403. Thus it is said in State v. Fuller, 105 Me. 571; 75 Atl. 315:

"The duty of establishing and constructing highways is imposed upon municipalities by public law, and in performing this duty the town is acting only as the political agent of the state. For its own convenience it is authorized to confer this power upon certain officers whose duties are expressly and by implication prescribed by statute."

Such duty has been customarily imposed upon the counties by the statutes of this state, but by an amendment to the constitution adopted at the general election held in 1916, a provision of the constitution as originally adopted prohibiting the state from engaging in any work of internal improvement unless authorized by a two-thirds vote of the people was declared not to apply to or affect the construction or improvement of public roads and highways, and it was further declared by said amendment that "the legislature·shall have power to provide for the construction and improvement of public roads and highways in whole or in part by the state, either directly or by extending aid to counties."

It has been held by the U. S. Land Department that a statute granting a railroad right of way over public lands of the United States grants an easement only, and that the lands over which the right of way is located may be disposed of by patent to others, subject to whatever right the railroad company may have in the same. Pensacola v. Louisville R. R. Co., 19 L. D. 386. And an easement, we think, is what our statute authorizes and what the grant in

question amounts to. The land board's certificate is entitled: "Grant of Easement for Public Highway," and contains a provision to the effect that a discontinuance of the use of the described tract as a public highway shall terminate the grantee's right. The county, in applying for and acquiring said right of way acted in the capacity of a political or administrative agent of the state; and whatever its title to the easement, it is held for the state and solely for the designated purpose, subject to the same legislative control as though the road had been declared to be a state instead of a "county" road.

The general provisions of the congressional granting acts and our state constitution limiting or conditioning the sale and disposal of the lands in question should be reasonably construed, in view of the object of the grant, and the purpose of the restrictions. They contemplate, principally, so far as the question here is concerned, the creation and maintaining of a permanent fund, which through proper investment shall furnish an income to be used exclusively for university purposes, and, incidentally, a fair sale at an adequate price. Unless such object or purpose is found to have become substantially impaired through granting a right of way for a county or public road neither the act of the state making the grant nor the statute authorizing it should be held a violation of the trust upon which the land is held or of the constitutional restrictions upon its disposal. For the natural tendency of the grant, reasonably made, across such lands, under the conditions described in the original opinion, is to enhance rather than to lessen their salable or rental value. But if it may be assumed that a right of way for a public road might be granted under such circumstances as to cause an actual and substantial loss to the trust property, the petition does not disclose such a condition. The general averment that the grant of the right of way has caused the University "great and permanent injury and loss," we think insufficient in a case like this. If the only

sustainable ground for enjoining the act of the land board
should be that it has acted so unreasonably as to make
that relief proper, the facts should be alleged with some
particularity and sufficiently to show on their face the
substantial injury and loss.

A close consideration of the brief filed in support of the
petition for rehearing has not caused us to doubt the cor-
rectness of our conclusion that the state land board, rather
than the university board has the right under the consti-
tution to the control and disposition of the lands in ques-
tion. The points that these lands are, by section 15 of
Article VII vested in the University, and that by section
17 of that article, the university lands are to be under the
"management" of its board of trustees have been ably
presented. But, to our minds, the argument ignores other
cognate constitutional provisions and places too much
stress upon the word "vest" in section 15 aforesaid and
the provision of section 17 aforesaid.

It is a mistake to suppose that our conclusion on this
question, "was largely based upon the theory that" sec-
tion 15 "has reference only to the property occupied or
used for educational purposes. We had that theory as to
the provision in section 17 for the management of the
lands of the University by its board of trustees. But we
did not then and do not now think that the declaration in
section 15 vesting lands "heretofore granted," or "here-
after granted unto the university as such, or in aid of the
instruction to be given in any of its departments" was
intended to be or is to be construed as so limited. A
doubt of the *intention to refer* to *those particular lands* by
that provision was expressed in the opinion, based upon
the fact that the grant was not unto the university *as such*
or specifically in aid of instruction to be given in *that insti-
tution*. And we did, in effect, construe the provision, as
far as applicable to these lands, as amounting only to a
designation of the University as the beneficiary under the
grant. The expression of said doubt need have no effect

in this case, however. For, as will be hereafter explained, we see no substantial reason for giving any greater effect to said provision of Section 15, if so construed as to include these lands.

It is suggested also in the present brief that the question of the management of the lands was discussed in the briefs at the former hearing, chiefly upon the provisions of section 17, while the court has determined the question largely upon the meaning and effect of section 15. Whatever the points discussed in that respect in the briefs presented at the original hearing we recall distinctly that the provision of section 15 was called directly to the court's attention in connection with the provision aforesaid of section 17. And, except for the provision of section 15, construed as a grant of the lands themselves, we should think it difficult to find any reasonable ground upon which to base the contention as to the management of these lands.

Preliminary to such further discussion of the question as may be thought advisable in this opinion, let the facts be repeated that the lands were granted, first, in 1881 to the Territory for the use and support of a university, when it should be admitted as a state; that there was then no university in Wyoming, or at least none recognized by law; and that although the university had been created or established in 1886 it was not referred to in the act of admission. It was mentioned, however, in the act of Congress of 1888, authorizing the leasing of the granted university lands; said act providing for a leasing board to be composed of the governor, superintendent of public instruction and auditor of the Territory, and declaring that all moneys derived from said leasing should become a part of the university fund of the territory, and be used for the support of "the University of Wyoming," and for no other purpose. It authorized such leasing under rules and regulations provided by territorial law, or, until the enactment of such a law, under rules to be adopted by

said leasing board approved by the secretary of the interior.  The act also declared that all such leases should expire within six months after the admission of the Territory as a state.  Thereafter, at the session of the territorial legislature in 1890, by an act approved March 14, 1890, rules and regulations for said leasing were established, containing provisions for the approval or report of the University Board of Trustees upon certain matters connected with the leasing of said lands, and requiring that Board to pay all expenses of the leasing of said lands, and that the proceeds of the leases should be paid to said trustees.  The operation of that act, however, was limited to a few months, for the Territory was admitted as a State on July 10, 1890, held its first election of officers under the Constitution early in September of that year and shortly thereafter the elected officers qualified.  Said Congressional act of 1888, made no provision for the ultimate sale or disposition of the lands; and a beneficiary of the grant, except as to said leasing income during the temporary period aforesaid, had not been selected or designated prior to the framing and adoption of the Constitution.

The provisions of Article XVIII of the constitution entitled ''Public Lands and Donations'' appear to have been considered by the convention on the same day, and immediately following the consideration and adoption of Art. VII.  As finally adopted and published, Article VII contains several titles in the following order: ''Education''—''The University''—''Charitable and Penal Institutions''—''Public Health and Morals''—''Public Buildings.''  In the original ''File,'' the name given by the convention to a measure introduced therein for consideration, and which in this instance was a substitute for several files reported by the committee to which they had been referred, there were two sub-titles under ''Education;'' first: ''Public Schools,'' under which appeared the first

fifteen sections, and, second: "The University," under which appeared sections 16 to 18 inclusive; and the remainder of the sections of the "File" were separately numbered under each heading,—1 and 2 under "Charitable and Penal Institutions," 1 under "Public Health and Morals," 1 and 2 under "Public Buildings." In the course of the consideration of the "File," Section 6 was stricken out, causing a renumbering of the sections so as to change the numbers of the two sections relating to the University from 16 and 18 respectively to 15 and 17, and the numbers of the subsequent sections of the Article were changed, probably by the revision committee, so as to run consecutively from the beginning—two sections having been added under the title "Public Buildings." And thus the sections of the article as published are numbered from 1 to 23 inclusive.

As bearing upon the question of the construction of those provisions, as well as the construction and effect of other constitutional provisions to be considered, we think it important to notice the provisions thereof as introduced and some of the changes made therein prior to adoption. We are referred by counsel in the present brief to one of the changes made and a remark made in the convention concerning it. As presented for consideration, the section (then 16, now 15, of Article VII) confirming the establishment of the university and vesting certain granted lands in that institution, did not expressly cover any lands previously granted by Congress, but only "lands which may be granted hereafter by Congress unto the University as such, or in aid of the instruction to be given in any of its departments, with all other grants, donations and devises for said university." The words "which have been heretofore granted or," preceding the words "which may be granted hereafter," now found in the section as a part of said provision, were inserted by amendment upon the motion of a member who is reported to have said, in making the motion (see Const. Proc. and Debates, p. 740):

"My attention has been called to the fact that there has already been a grant of seventy-two sections to this university, and I therefore desire to insert   *   *   *   or lands which have heretofore been granted."

That statement to the effect that the 72 sections had been granted to "this" university was erroneous, as we know, for the grant was not to any particular institution. But, no doubt, it was in the mind of the moving member and the convention that those sections should be included "with lands that might thereafter be granted," supposing that the sentence as amended would declare the previously granted lands to be vested in the university. Not-withstanding the technical inaccuracy of the sentence, even as amended, to express such probable intention, we shall accept the section, for the purpose of this case at least, as declaring that the previously granted 72 sections of land shall vest in said university.

It was stated in our original opinion, as had been suggested by counsel, that the contention that the lands became university lands because "vested" in the university by the Constitution finds support in the opinions of two Attorneys General of the state, citing At. Gen. Rep. 1902 and id. 1907-8. A closer examination of the first of said opinions leads us to doubt that the lands in question were considered at all in that opinion. Its effect is stated in the headnote as published in the report as follows: "The Trustees of the State University have authority to sell real estate conveyed to said trustees and execute deeds therefor." And the first paragraph of the opinion, addressed to an officer of the university, reads as follows:

"Replying to your communication of July 18th, in relation to the authority of the Board of Trustees of the State University to sell the property embraced in the enclosed deeds, I have the honor to advise you as follows:" The opinion then refers to Section 17 of Article VII, and also

to the other clause of that Article, vesting in the university lands heretofore and hereafter granted by Congress unto the university "with all other grants, donations or devises," for said university or any of its departments, italicising the word "devises" and concludes: "I am, therefore, of the opinion that the Board of Trustees have the power and authority, under their general supervision of the property of the university, to sell this land and execute deeds therefor." Such concluding words seem to indicate that the deeds should be executed in the name of the Board of Trustees and not in the name of the state; and the whole of the communication fails, we think, to disclose that the opinion had any reference to lands granted by Congress to the state for university purposes. The headnote to the other opinion, rendered in 1907, states its effect to be that the title of lands granted to the state by the general government for the benefit of the university "vests" in the university, that their management and disposition is under the control of the university board, and that they cannot be sold without the consent of said board. And that seems to have been based upon the propositions stated in the opinion that to "vest" property in a person or body corporate, means that the absolute title— "absolute ownership"—passes with a present right of alienation; that the title conferred upon the state by Congress was by the state at once vested in the university through the medium of the Constitution, and that the Constitution is silent as to how or by whom such lands may be sold. We think that upon the facts controlling in this case each of said propositions is erroneous. It is not now contended that the title of the lands was vested, or that the university acquired absolute ownership thereof. On the contrary it is conceded, and properly so, that the *title* remains in the state, notwithstanding the said vesting provision of the constitution. And upon principle, in view of the language, purpose and conditions of the grant, the relation between the state and the United States under it,

and the relation between the state and the university, there cannot, we think, be any other reasonable conclusion. State ex rel v. Irvine, 14 Wyo. 325, 84 Pac. 90, Id., 206 U. S. 278, 27 Sup. Ct. 613, 51 L. Ed. 1063; Betts v. Com'rs., 27· Okl. 64, 110 Pac. 766; Haire v. Rice, 204 U. S. 291; 27 Sup. Ct. 281, 51 L. ed. 490; State v. Vicksburg & Nashville R. R. Co., 51 Miss. 361; State v. Williams Cypress Co., 131 La. 62, 58 So. 1033; Cox v. University, 161 Ala. 639, 49 So. 814.   The Constitution does not declare that the *title* shall vest; nor does a vesting of the lands necessarily mean a vesting of the fee or absolute ownership.   But the word ''vest'' may be construed, whether found in a statute, constitution or in a privately executed document, with reference to the subject matter, to reasonably carry out the intention fairly to be gathered from the instrument wherein it is found, as in the case of any other word or phrase.   Taylor v. Frobisher, 5 D. G. & Sm. 191, 64 Eng. Reprint 1076; Coverdale v. Charlton, 3 Q. B. Div. 376; s. c. 4 Q. B. Div. 104; In re Brown, L. R. Ch. Div. 1895; Vol. 2. 666; The Mayor, et al. v. The L. & N. W. Ry. Co., et al., 16 Q. B. Div. 572; People v. Kerr, 27 N. Y. 188; Busick v. Busick, 65 Ind. App. 655, 115 N. E. 1025; 116 N. E. 861; Leadville v. Bohn Min. Co., 37 Colo. 248, 86 Pac. 1038, 8 L. R. A. (N. S.) 422, 11 Ann. Cas. 443; Rolls v. Vestry of St. George, 14 Ch. Div. 785; Stracey v. Nelson, 12 M. & W. 535; In re Phillip's Est. 205 Pa. 511; 55 Atl. 212; 40 Cyc. 196; 29 Am. & Eng. Ency. L. 1047-8.

In the English case of Taylor v. Frobisher, decided in 1852, it was said: ''The word 'vested,' though it certainly has a technical or strictly legal meaning, especially when applied to future interests in real estate, is often used in a different sense.   Thus, Lord Thurlow says 'contingent or executory interests may be as completely *vested* as if they were in possession:' Barnes v. Allen, (1. Bro. C. C. 181), using the word in the sense of transmissible.   In Berkeley v. Swinburne (16 Sim. 275), the Lords Commissioners,

upon the context of a will, * * * construed the word *vest* to mean indefeasible, * * *. In Glanvill v. Glanvill, (2 Mer. 38), Sir. W. Grant construed the word 'vested' in its ordinary sense, observing that there was no evidence from any part of the will that the testator did not affix to the word its precise legal meaning.''

And in the cited case the word was considered as not used in the ordinary sense, but in the sense of ''not subject to be divested,'' or ''indefeasible,'' the learned chan-. cellor saying that it is only by fixing this meaning to the word that the intention apparent on the will of the testatrix could have been carried into effect in events which were within her contemplation. In Phillip's Estate, supra, the Supreme Court of Pennsylvania held that the testator had used the word ''vest'' in the sense of ''payable'' or ''taking effect in possession,'' and not in its technical sense. And the same court, in McClellan's Estate, 221 Pa. St. 261, 70 Atl. 737, considered the meaning of the word ''vest,'' used in a will wherein a testatrix devised and bequeathed her estate to her husband for the term of his life, with power, by his last will and testament at his death ''to appoint and vest,'' the remainder of the estate in such persons as he sees fit, and said:

''Whatever may have been the original meaning of the word, as denoting the investiture of the fee, the word is now applied to estates of personalty as well as estates in land. In this instance, the husband of the testatrix could have sold the estate in parcels by appointing it to A, for life, with the remainder to B. in fee, and no one could doubt that he would thereby have vested an estate in each of those parties. And with the same effect he could have vested an estate in a trustee to serve their interests.''

In Coverdale v. Charlton, supra, the question at issue was determined upon the meaning of the word ''vest''

found in a statute declaring a street to be vested in the
local board of a parish. In the cited case, the case of
Hinde v. Chorlton, L. R. 2 C. P. 102 was relied on in the
appellate court, especially the language of Willes, J., con-
struing a private Act empowering the sale of pews in a
church, and providing that upon such sale the pew should
be "vested" in the purchaser; that justice having said:

"The language  *  *  *   appears to me to be satisfied
by holding that they gave a right to the trustees to grant,
not the soil and freehold of the pew, but the right to the
pew, that is to say, the right to use the pew for the purpose
of hearing divine service  *  *  *.   There is a whole series
of authorities in which words, which in terms vested the
freehold in persons appointed to perform some public
duties, such as canal companies, and boards of health,
have been held satisfied by giving to such persons the
control over the soil which was necessary to the carrying
out the objects of the Act without giving them the free-
hold."

Bramwell, L. J., in his opinion in the cited case (Cover-
dale v. Charlton), referred approvingly to the meaning
put upon the word by Willes, J., in the language above
quoted, saying:

"I confess I have my misgiving as to the meaning of the
word 'vest'  *  *  *.   I am strongly inclined to put the
same meaning upon that word which Willes, J., has put
upon it in the case cited, supported, as his opinion appears
to be by the reference he makes to numerous authorities,
none of which are enumerated in his judgment, but which
he says do exist. Coming as it does from that learned
judge, his opinion is entitled to the highest respect. And
on account of the reasonableness of such an interpreta-
tion, I am disposed to hold that this 'street' vests without
any property in the freehold of the soil. The word 'vest'

may have two meanings; it may mean that a man acquires the property *usque ad coelum* and to the center of the earth, but I do not think that to be its meaning here. One construction of the word 'vest' here is that it gives the property in the soil, the freehold, the surface, and all above and below it; but that would be such a monstrous thing to say to be necessary for the proper control of the streets by the local board, that I cannot suppose it to mean such a thing. * * * What, then, is the meaning of the word 'vest' in this section? The legislature might have used the expression 'transfer' or 'convey,' but they have used the word 'vest'. The meaning I should like to put upon it is, that the street vests in the local board qua street; not that any soil or any right to the soil or surface vests, but that it vests qua street. I find some difficulty in giving it a meaning, and I do not know how far it adds to the words 'shall be under the control of.' The meaning I put upon the word 'vest' is, the space and the street itself, so far as it is ordinarily used in the way that streets are used, shall vest in the local board.'' * * *.

Brett, L. J., delivering also an opinion in the case, said:

''According to the ordinary rules of construction we must give an interpretation if we can, not only of the words 'be under the control of,' but to the words 'vest in;' and we must give, if we can, some meaning to the words 'vest in,' other than and different from that which we give to the words 'be under the control of.' What is the ordinary legal significance of the words 'vest in' when applied to the subject matter of property? I think its signification is to give a property in. * * * But when we have decided that the words 'vest in' mean to give a property in, a further question would be, in what does it give the property? That must depend upon the subject to which those words relate, and that is not land, but street; the section does not say that the land 'shall vest in,' but

that 'the street shall vest in.' * * *. 'Street' means more than the surface. It means the whole surface, and so much of the depth as is or can be used, not unfairly, for the ordinary purpose of a street. * * * It does not include such a depth as would carry with it the right to mines, neither would 'street' include any buildings which happen to be built over the land, because that is not a part of the street within the meaning of such an Act as this."

Under a statute declaring the fee of streets to be opened under it "vested" in the corporation of New York, it was held, in People v. Kerr, supra, that such fee was held by the city "in trust for the public use of all the people of the State, and not as a corporate or municipal property," quoting from the syllabus, and, further, that such trust is under the unqualified control of the legislature so that any appropriation of it to a public use by legislative authority is not a taking of private property requiring compensation to the city to render it constitutional. One of the justices said that, in his opinion, the interest or estate thus conferred upon the city is limited by the purposes of the grant, notwithstanding the broad language of the statute. And another justice said:

"The streets in question are not owned by the corporation of New York. The corporation cannot sell or dispose of them, or even divert them to private use. Any and all titles or interest which the city has in them, is held for public use; is public property, and not private or municipal. * * * It cannot be pretended that the absolute title and estate in the land embraced within the streets, have ever been granted to the corporation from any source. * * * It is not a trustee for the inhabitants of the city alone, but for the whole people. * * * The city corporation, as fee-holder of the streets, in trust, for public use as highways, is but an agent of the state."

A statute of Colorado having provided that all avenues, streets, parks, and other places designated or described as for public use on the map or plat of any city or town shall be deemed public property, "and the fee thereof be vested" in such city or town, the Supreme Court of that state, in Leadville.v. Bohn Min. Co., supra, held that the term "fee" was not used according to its technical legal meaning, but that it was intended by the act to vest in the city such estate or interest only as might be reasonably necessary to enable it to utilize the surface of the street and so much of the ground underneath as might be required for laying gas pipes, building sewers, and other municipal purposes, the court saying:

"It was plainly the intention of the dedicator to part with the title to so much of this property only as was necessary to effectuate the purpose of establishing certain streets and alleys."

Then, as this court has said (Rasmussen v. Baker, 7 Wyo. 117, 50 Pac. 819), 38 L. R. A. 773, "the primary principle underlying an interpretation of constitutions or statutes is that the intent is the vital part, and the essence of the law." And the rule requires that the instrument must be construed as a whole in order to ascertain its intent and general purpose and also the meaning of each part. 12 C. J. 707; In re Leasing State Lands, 18 Colo. 359, 32 Pac. 986.

The subject matter here is public lands granted to the state for the use and support of a university, under specified conditions as to sale and use of the proceeds, including conditions that such proceeds shall be safely invested and held *by the state* as a permanent fund,—the income to be used only for university purposes, and that the university provided for shall remain "under the exclusive control of the state." Upon the state's acceptance of the grant, it was placed in the position of a trustee; it holds

the lands for the purposes expressed in the grant, and no other, and is under at least a moral obligation to conform to the terms and conditions contained in the granting act. Board v. McMillan, 12 N. D. 280, 96 N. W. 310; State v. V. & N. R. R. Co., supra.

Hence, within the meaning of "absolute" as "unconditional," the state did not have absolute ownership, and could not grant such an ownership to the university. Its title, when finally acquired, was or would be a title in fee, but held in trust subject to the stated conditions. Designating the beneficiary and providing for the control, leasing and disposal of the lands would seem to comprehend the full duty of the state, if not its full authority, through the exercise of its legislative powers, with respect to the lands themselves; that is to say, aside from its continuing obligations relating to the use of the proceeds. And clearly, we think, there might be a designation by law of the beneficiary without either transferring to it the state's title to the lands or conferring upon it the right to control or manage them. With the state's *title* transferred to the institution would pass also the *trust* imposed by the grant, and, so holding the title, the institution would be subject to the rules and regulations provided by law for the execution of the trust, including the sale and disposition of the lands; the same as any state agency selected to administer a governmental function or duty. The state itself would be subject to such laws, and could not surrender its responsibilities by a transfer of the granted lands to an institution of its own creation and over which it is required by the very terms of the grant to retain exclusive control.

And the state must act through its legislative power in administering a trust or in creating and appointing agents or officers to perform the duties thereof. Perry on Trusts, Sec. 41; State v. V. & N. R. R. Co., supra. As said also in the case cited the state "must by statute derive the machinery to carry out the object" of the trust. What ma-

chinery would be provided by the provision alone vesting the lands in the university? How and when, by what rule, or upon what terms, could the lands be sold to provide the permanent fund contemplated and required by the granting act, or even leased to provide an income from that source, in the absence of some additional provision, either in the constitution or statute regulating such matters? And they may be regulated through the medium of the constitution, as well as by statute. State v. Rice, 33 Mont. 365, 83 Pac. 874; People v. May, 3 Mich. 604. For as said in the last cited case, quoted in Rasmussen v. Baker, supra, the constitution is law, the people having been the legislators, as much as the statute is law, the senators and representatives being the legislators.

The university, though declared by statute to be a body corporate by a specified name, is not separate from or independent of the state; but it is so much a dependent part of the state that even upon a vesting of title through such a provision as that before us referring to public lands of the state, the lands would still remain the lands of the state. Cox v. Univ. Trustees, 161 Ala. 639, 49 So. 814. And so far as the courts have passed upon the question of the relationship between the state and an educational institution created and maintained by it for a public purpose, the dependent position of the latter as a mere state agency with respect to property or funds granted to the state for the purposes of the institution is well established. Thus in the case of Regents vs. McConnell, 5 Neb. 423, the court say as to the state university constituted a body corporate by statute:

"But this incorporation * * * is not, in any sense, to be considered in the nature of a private, eleemosynary corporation for the general promotion of learning, because its whole interests and franchises are the exclusive property and domain of the government itself, and therefore, it is in the strictest sense a public corporation."

In University v. Maultsby, 43 N. C. 257, the court say:

"It is true that, since incorporation, there may have been donations to the college: but that would not alter the nature of the foundation, nor the character of the corporation. It is merely a political agent,—an instrument of state; and it follows that its organization, devotion and government; its power of acquiring property; and the disposition of the property belonging to it—at all events, so far as it is of public endowment, are subjects for legislative regulation."

With reference to school lands granted to the state of Louisiana by Congress, the supreme court of that state said, in Board v. Ober, 32 La. Ann. 419:

"The title to this land had never been in the parish board of school directors. The title was in the state, under the donation of the general government, and was held for a specific purpose, with authority to sell the lands and a mandate to hold the proceeds and invest them for the benefit of the schools. No doubt it could confer authority upon the parish boards of directors to sue in her stead (for the recovery of such lands) but she has not done it."

And that was later quoted with approval in State v. Williams Cypress Co., 131 La. 62, 58 So. 1033. See also State v. Stark, 111 La. 594, 35 So. 760. The Supreme Court of Florida in State ex rel v. Bryan, 50 Fla. 293, 39 So. 929, said:

"The corporation is itself founded by the state through property derived from the government of the United States. These trustees are made by its legislation the agents of the state to collect and disburse property appropriated by the General Government to the state for a public purpose. There is not and never was any private property in the trustees in the funds. They were derived from

the government. The founder of this institution was the government of the State of Florida and the property which constituted its basis was public moneys of the state of Florida derived by it from the government of the United States in trust for the establishment of an institution of this character. It never was the purpose of the state of Florida to give these trustees any private right to this property. Throughout the whole legislation they are shown to be simply public agents to manage public property.''

In the Mississippi case above cited (State v. R. R. Co.) the principle was stated concerning funds granted to the state by Congress in aid of instruction in agriculture and the mechanic arts:

''These universities are public eleemosynary corporations which dispense the bounty of the state, their founder, through such persons as it directs. * * * Both of them are subject to change and modification by the legislature. Against the state, neither of them can set up a vested right to property, or corporate franchises. Their governing boards are appointees of the state without right or power to continue the succession. The state could withdraw the interest of this fund from them, and found another institution and make it the recipient of it. * * * The title of their property is in the state.''

The Alabama case above cited (Cox v. Trustees) involved a question of adverse possession of lands granted to the state for university purposes. They had been granted expressly for the benefit of the University of Alabama, leaving to the state no choice in the selection of the institution; and the expressed purpose was partly to replace property of the university destroyed by fire. Thereupon a statute was enacted by the state legislature declaring that the ''title'' to said lands ''shall be vested'' in the board of trustees of the university, and providing also that the trustees thereof ''shall have the power to appoint one or more per-

sons   *   *   *   one or all of whom may make sale as the trustees may direct.'' Thus, with the vesting of title was a provision expressly conferring the power to sell the lands. Yet the court said:

''It therefore clearly appears that the University of Alabama, by whatever corporate name or under the control of whatever agents it may be, is a. part of the state; that it was founded by the state; that it is under the state control, and that the University is therefore a public municipal corporation; that as to its lands the state is and has always been the trustee; and that the board of trustees are mere agents of the state.   *   *   *   The cases above referred to settle the law in this state that public institutions created by the state purely for charitable and educational purposes are a part of the state, or a mere agency of the state; that the property of such corporation is really and in fact the property of the state.   *   *   *   It is true that the state granted the legal title of these lands to the board of trustees of the University of Alabama.   *   *   *   While for some purposes they were then the lands of the University, we think we have shown on both reason and authority that they were still the lands of the state.''

The Constitution of this state, unlike the statute of Alabama, does not confer control or power of disposition of the lands upon the university board, unless that is the effect, as contended, of the provision of section 17, Art. VII for a board of trustees of the university to have the management of ''its lands and other property.'' That provision must be construed, first, in view of the principles above stated concerning the ownership of these lands and the conditions thereof, and, in the next place, in connection with the several provisions of Article XVIII relating particularly to the subject of lands granted the state by Congress, or, as expressed in the title given to the Article, ''Public Lands and Donations.'' The first section thereof declares the state's acceptance of the grants made ''for educational purposes,

for public buildings and institutions.'' Section 3 establishes a board of land commissioners consisting of the governor, superintendent of public instruction, and secretary of state, ''who, *under such regulations as may be provided by law, shall have the direction, control, disposition and care of all lands that have been heretofore or may hereafter be granted to the state.*'' And by section 4, it is provided that the *legislature shall enact the necessary laws for the sale, disposal, leasing or care of all lands* that have been, or may hereafter be *granted to the state.* These provisions, as shown by the published constitutional debates, were well understood by the convention when Article VII, including the provisions for the university aforesaid, was considered. Said article then included a provision now section 13 as changed and renumbered, declaring that the governor, secretary of state, state treasurer and superintendent of public instruction, shall constitute a board of public lands, to have the direction, control, leasing and disposal of lands of the state granted for the support and benefit of public schools. The name of the board was changed to land commissioners, as it now appears in the Constitution, to conform to the title given the land board in the articles on public lands. That article having named but three members of the board, omitting the state treasurer named in the board provided for in Article VII, a suggestion was made that the two sections should provide for the same or only one board. Mr. Hoyt, Chairman of the committee which reported the substitute file, which, when adopted, was to become Art. VII, and who then held the office of President of the University, said that it would be necessary to make the two sections conform, and he moved to make said section in the article on education conform, so far as the title of the office is concerned, ''to the section contained in the article on public lands.'' A motion was then made by another member to strike the words ''state treasurer,'' which would have made the two sections conform as to the component members of the board. It then appears that an-

other member of the convention, to avoid, as he stated, any confusion in the two boards, suggested that the matter be referred to a joint committee composed of the two committees (Education and Public Lands), and if necessary that the matter "be embraced in one section." Mr. Hoyt then inquired: "Could not the revision committee attend to that? Is not this the organization contained in the article on public lands?" The matter was finally disposed of as follows (Constitutional Debates, page 738):

"Mr. Hoyt: I move that the revision committee be authorized to make Sec. 14 of this file conform to the section regarding the same subject contained in the article on public lands."

"Mr. Brown: Is that not one of the duties of the revision committee to look after just such things as this and make them conform. I see no use of authorizing them to do this thing when they already have that authority."

The revision committee evidently did not understand that they had such authority, for the two sections as adopted were left unchanged, each creating, apparently, a different board, one afterwards known as the Board of School Land Commissioners, and the other as the Board of State Land Commissioners. But, as stated in the former opinion, they are now consolidated by constitutional amendment adopted in 1922, constituting the "Board of Land Commissioners," consisting of the same members as the former board of School Land Commissioners, which, under such regulations as may be provided by law, and subject to the limitations of the constitution, the amendment declares, "shall have the direction, control, disposition and care of all lands that have been heretofore or may hereafter be granted to the state."

If section 17 of Article VII includes these public lands, then, we think, it clearly conflicts with Article XVIII in that respect, which having been the last adopted might be

held controlling, perhaps, as the latest and final expression of the convention, unless, indeed, by proper construction, the several provisions may be harmonized. It is argued here that the provision of section 17 provides especially for matters concerning the university is the one that should be allowed to remain with every possible effect of the words found therein in this particular. But the words "its lands" can well be understood and limited, as in the original opinion, to apply only to lands acquired for the university either in its corporate name or otherwise to be occupied and used, as lands in the ordinary conduct of the university affairs and not held as the granted public lands are, in trust and solely for the purpose of sale to create a permanent fund, or for lease prior to sale for the income to be derived therefrom. There does exist that distinction between these lands and other lands or property which may be owned by the university unconditionally and from which it acquires the benefit of occupation or possession necessary or convenient in the active conduct of the affairs of the institution or any of its departments. When these lands or any part thereof are sold, the proceeds go into a permenent fund to be held by the state, no part of the principal of which may be used, but only the interest, for university purposes, presenting a different situation from that which would result from the sale of lands conveyed to or owned by the university unconditionally.

On the other hand, the above mentioned provisions of Article XVIII expressly cover *all lands* granted to the state, which do not seem to be capable of any limitation unless, perhaps, it might be held to be limited by the first section of the article accepting the grants "heretofore or hereafter made by the United States to the state, for educational purposes, for public buildings and institutions and for other objects," but even with that limitation, the lands are covered by it and would be unmistakably covered by the provisions above stated found in sections 3 and 4 of said Article XVIII. And that seems to have been the construc-

tion placed upon it by the legislature, not only in the general statute providing for the leasing, sale and disposition of its public lands, which places the matter within the control of the land commissioners, but also in the statute relating to the duties of the university board of trustees, which provides that said board shall have power "to hold, manage, lease, or dispose of, according to law, any real or personal estate, as shall be conducive to the welfare of the institution;" thus not recognizing any condition affecting the right to sell, except that it shall be conducive to the welfare of the institution.

From all that has been said upon the subject in the original opinion and in this, we remain convinced that the managing power of the board of trustees of the university required by the constitution to be provided for by law does not apply to or affect the lands included within the grant in question. The petition for rehearing will be denied.

*Rehearing Denied.*

Blume and Kimball, JJ., concur.

NOTE—See Headnotes (1) 29 C. J. pp. 394, 403 (1926 Anno); (2) 29 C. J. p. 403; (3) 29 C. J. p. 874; (4) 32 Cyc. p. 874; (5) 32 Cyc. p. 874; (6) 32 Cyc. pp. 863, 874; (7) 32 Cyc. p. 874; (8) 32 Cyc. p. 874; (9) 12 C. J. p. 707; 36 Cyc. p. 1128; (10) 32 Cyc. p. 874; (11) 36 Cyc. p. 845 (1926 Anno); (12) 11 C. J. pp. 976, 991; (13) 32 Cyc. p. 874; (14) 32 Cyc. p. 874.