No. 2970

Second Circuit

HEARD v. MONROE SAND AND GRAVEL COMPANY, INC.

(June 28, 1928. Opinion and Decree.)

Theus, Grisham and Davis, of Monroe, attorneys for plaintiff, appellee.

Hudson, Potts, Bernstein and Sholars, of Monroe, attorneys for defendant, appellant.

ODOM, J. On September 20, 1922, a written contract was entered into between Mrs. Fay Piner Heard, through her husband as agent, and T. E. Stephenson, a resident of Caddo parish, Louisiana, under the terms of which said Stephenson acquired the right to mine, sever and remove sand and gravel from thirty acres of land belonging to Mrs. Heard near West Monroe, in Ouachita parish, this privilege to extend over a period of fifteen years.

The consideration for this contract was $250.00 cash and the obligation on Stephenson's part to pay Mrs. Heard ten cents per cubic yard for all sand and gravel removed, the payments to be made as the sand and gravel was removed.

On September 19, 1922, said Stephenson entered into a similar contract with Mrs. Josephine Faulk to remove sand and gravel from 280 acres of land adjoining that of Mrs. Heard, the only essential difference between the two contracts being that Stephenson was to pay Mrs. Heard 10 cents per cubic yard for sand and gravel removed from her land, and 7½ cents per cubic yard for that which he might remove from Mrs. Faulk's land.

These contracts were filed and recorded in the notarial records of Ouachita Parish on September 20, 1922. On that date, the said Mrs. Fay Piner Heard, through her husband, and said T. E. Stephenson, entered into a separate contract, in which it is recited that on September 19, 1922, said Stephenson had made a contract with Mrs. Josephine Faulk covering the sand and gravel on the land owned by Mrs. Faulk, and that it was agreed in said contract that Stephenson should pay to Mrs. Faulk 7½ cents per cubic yard for all sand and gravel mined and removed from her land, and article 3 of the contract reads in part as follows:

"It is now agreed and expressly understood that the said T. E. Stephenson shall pay to the said *Mrs. Fay Piner Heard* the sum of two and one-half cents per cubic yard for each and every cubic yard of the said gravel, etc., removed from the said premises of the said Mrs. J. Faulk and that the said payments shall be made to her at each and every payment time, that is to say, on each month when the said T. E. Stephenson shall pay to the said Mrs. Faulk the seven and one-half cents for each cubic yard of gravel, etc., removed from her premises, he shall at the same time make a payment of two and one-half cents to the said Mrs. Fay Piner Heard on the same cubic yards of gravel, etc."

The consideration for this contract is set out in article 4 of the contract, which reads in full as follows:

"It is agreed that the consideration for the making of this contract is that the said Mrs. Fay Piner Heard has through her agent J. Faulkner Heard, arranged and contracted an agreement and has done all of the work incidental thereto of the contract had by and between the said T. E. Stephenson and Mrs. J. Faulk signed on the 19th day of September, 1922, and the further consideration of the granting to the said T. E. Stephenson a like contract on her said land adjoining the said premises of the said Mrs. Faulk. And it is agreed that the said Mrs. Heard through her agent J. Faulkner Heard, has done and given other valuable services in the arrangements of selling the said gravel, etc., to the road building committees."

This separate contract was also recorded in the notarial records of Ouachita parish on September 21, 1922.

On November 25th following, the said T. E. Stephenson, who had obtained these lease contracts from Mrs. Heard and Mrs. Faulk and who had entered into the separate contract with Mrs. Heard to pay her 2½ cents per cubic yard on the gravel taken from Mrs. Faulk's land, and J. A. Stephenson, said to be a resident of Shreveport, Louisiana, and Robert O. Randle, an attorney of Monroe, Louisiana, organized a corporation under the name and style of "Monroe Sand & Gravel Company, Inc.," the objects and purposes of which were to "search for sand, gravel and other minerals * * * to drill, mine and excavate for such products * * * and to sell and dispose of the same."

The capital stock was fixed at $25,000.00, divided into 250 shares of the par value of $100.00—"and said stock shall be paid for in cash, in property or in services."

The corporation was authorized to begin business when one-half of the capital stock was subscribed and paid for.

The stock was subscribed for as follows:

T. E. Stephenson—119 shares_____$11,900.00
J. A. Stephenson—4½ shares_____   450.00
Robert O. Randle—6 shares_____   600.00

T. E. Stephenson offered to and did pay for the stock which he took, in property which was appraised by J. A. Stephenson and Randle, the other stockholders, as follows:

The Heard lease, appraised at_____$1,050.00
The Faulk lease, appraised at_____ 9,800.00
Improvements on above leases_____ 2,560.00

On January 3, 1923, the three stockholders increased the capital stock to $125,-000.00, and stipulated that the additional stock might be paid for—"in cash, in property, in services, or by the enhancement in value of the property of this corporation."

Whether this additional stock was ever taken and paid for is not disclosed by the record.

There is no definite statement as to when this corporation began business, but we gather it was about December 1st or 15th, 1922.

At any rate, the corporation immediately began to pay to Mrs. Heard the royalty of 2½ cents per cubic yard on the gravel taken from the Faulkner lease, as per the contract which she had with T. E. Stephenson. The first payment was made to her on January 19, 1923, about a month and a half after the corporation was organized. It continued to make her monthly payments for thirty-three consecutive months, the last payment being made on October 20, 1925. From and after that date, the corporation refused to make further payments.

On December 18, 1925, plaintiff, Mrs. Heard, filed this suit against the corporation, alleging that the defendant had taken over said leases and had continued to take sand and gravel from the Faulk lease and had paid the royalty under the separate contract with Stephenson until October, 1925, and was due the royalties for November and December, amounting to $501.37, for which amount she asked judgment.

Admitting that Stephenson had signed the contract alleged upon, that it had taken from the Faulk lease the amount of gravel alleged for November and December and had refused to pay for the same, the defendant corporation set up as a defense the following:

1. That in the acquisition of the Faulk lease, it did not assume or obligate itself to discharge any liability of Stephenson to Mrs. Heard under the separate contract alleged upon; alleging that T. E. Stephenson

   "who is in active charge of the management and business and affairs of your respondent corporation, paid or caused to be paid, out of funds belonging to this respondent, an amount equal to the commission referred to and provided for in the said contract between the said Stephenson and the plaintiff herein."

2. That said Stephenson was without right or authority to pay the same; that the contract between Stephenson and Mrs. Heard was personal, and defendant had not assumed the same; and that said Stephenson "under a mistaken sense of obligation, undertook to pay and did pay" certain amounts to Mrs. Heard.

3. In the alternative, if the court should hold that the acts of said Stephenson, its general manager, in making said payments, which are admitted, rendered defendant liable for future payments, upon the theory of implied assumption of the contract, then in that event defendant contends that the contract between Stephenson and Mrs. Heard was without consideration and was entered into through fraud and error and is therefore null and void.

3 We take up and consider these defenses in inverse order.

Enlarging upon the allegation that the contract between Stephenson and Mrs. Heard, by which he agreed to pay her 2½ cents per cubic yard for each cubic yard of gravel taken from the Faulk lease, was entered into without consideration and was procured by Mrs. Heard through error and fraud, counsel for defendant, in answer, specified that the portion of the contract which stipulated that the consideration therefor was that Mrs. Heard had arranged the contract and agreement between Stephenson and Mrs. Faulk and had done all the work incidental thereto, was erroneous, and that said Mrs. Heard, by and through her husband as her agent, had falsely and fraudulently represented that he had done so, and acting upon the belief that he had done so said Stephenson had been induced to sign the contract and that said false and fraudulent representations constituted the principal motive for Stephenson signing the contract; and, further, that it is not true, as recited in the contract, that plaintiff, through her said agent, had done and given other consideration for the contract.

While it may be true that J. Faulkner Heard, plaintiff's agent, did not perform all the services in getting Mrs. Faulk to make the lease to Stephenson, which he represented to Stephenson he had done, he had, nevertheless, taken an interest in the matter and had gone to see Judge McLendon, who represented Mrs. Faulk, on two occasions, discussed the matter of the lease with him, and had ascertained from McLendon that Mrs. Faulk would lease, provided she got a royalty of seven and one-half cents per cubic yard.

Heard had tried to get the lease from Judge McLendon for himself, but McLendon refused to lease to him, but told Heard tht if he could get a contract stipulating a royalty of seven and one-half cents he would sign. McLendon says that Heard did not induce him to sign the contract for Mrs. Faulk, and that is no doubt true. But the fact is that Heard was doing what he could for Stephenson,

at least to the extent of going to McLendon and finding out just what he wanted.

When Heard learned that McLendon would sign for Mrs. Faulk, he went back to Stephenson and told him what kind of a contract could be made, and told Stephenson to go to see McLendon. Stephenson went to see McLendon on the following day and closed with him for the lease on the terms which Heard had said could be made.

There was nothing said between McLendon and Stephenson as to what Heard had done. Stephenson personally closed the trade with McLendon. That was on September 19th. On the following day Stephenson voluntarily signed the contract with Mrs. Heard by which he obligated himself to pay her two and one-half cents per cubic yard for the gravel taken from the Faulk lease, in which contract he specifically recognized that Heard had been of some service to him in the negotiations. That service may have been slight, but evidently Stephenson recognized that it was of some value to him. He could not have been seriously misled by what Heard had told him.

Stephenson testified that he wanted the Heard property and the Faulk property, both or none. He went to the Heard property and found Heard there making some excavations. He told Heard he wanted the property, "and he, (Heard) told me I could get, he thought, 160 acres from Judge McLendon." He adds that Heard told him that he, Heard, had an option on the Faulk property which would expire in a few days, and says Heard told him "though you better go to see—if you want the Judge's property you had better go to see him yourself. And I told him I would."

He says he sought McLendon and asked what he wanted, and McLendon told him, and the contract was closed.

Stephenson, as a witness, laid stress upon the fact, as he stated, that Heard told him he had an option on the Faulk land and he thought he had to pay Heard in order to get the Faulk lease. It can hardly be true that Stephenson thought, when he signed the separate contract with Mrs. Heard, that he had to pay Mrs. Heard a royalty on the Faulk lease, in order to get it, because he obtained the Faulk lease on the 19th and made the contract with Mrs. Heard one day later. If he had thought originally that Heard had an option on the Faulk land he later found that was not true, for in his negotiations with McLendon, Heard's name was not mentioned; and Stephenson knew that even if Heard did have an option on the land he could not exercise his rights under it after McLendon had signed the lease. Stephenson, therefore, when he made the contract with Mrs. Heard, was acquainted with all the facts, and it cannot be said that he was induced to sign the contract through fraud and error.

Again referring to the consideration for the contract, we note that it recites that—

"* * * and the further consideration of the granting to the said T. E. Stephenson a like contract on her said land adjoining the said premises of the said Mrs. J. Faulk."

The Faulk contract was signed on the 19th and the Heard lease contract was signed the following day. Stephenson testified that he wanted a lease on both tracts or none. Having obtained a lease on the Faulk land, he went back to Heard, with whom he had closed no lease; but he did close with Mrs. Heard on the 20th.

The contract sued upon recites that one of the considerations for making it is that Mrs. Heard had agreed to lease her land also. The contract sued on being the voluntary act of Stephenson, we must give effect to its provisions as to the consideration upon which it rests.

Stephenson cannot repudiate the plain provisions of the act. Our conclusion is that he was bound under the contract.

(1-2), The defendant corporation's main defense is that even though Stephenson may have been bound, it did not assume his contract with the plaintiff, and that its payment of the royalties to her under the provisions of the contract has not rendered it liable for future payments under the theory of an implied assumpsit of Stephenson's obligations.

Our conclusion is, and we hold, that the defendant corporation is bound to the same extent that Stephenson himself was bound, not solely upon the ground, as argued by counsel for plaintiff, that there was an implied assumpsit or a quasi contract, but upon the ground that a consideration of all the facts and circumstances connected with the formation of the corporation, and its subsequent management, lead irresistably to the conclusion that the business carried on by the corporation was in fact but a continuation of Stephenson's business under a new guise; a merger of his private business into a corporation of which he was the sole managing head and director and of which he was practically the sole owner.

In other words, in the formation of the corporation there was no more than a novation or substitution of the corporation for Stephenson. Stephenson was the directing mind in the formation of the corporation, and under his exclusive control and direction of the affairs of the corporation, it took up and made his contract its own.

Stephenson wanted to engage in the sand and gravel business, and in furtherance of his plans he procured the leases from Mrs. Heard and Mrs. Faulk. He placed machinery on the ground preparatory to the beginning of operations. He then organized the corporation, composed of three persons, himself, J. A. Stephenson and Robert O. Randle. The capital stock was placed at $25,000.00 and the company was authorized to begin business when one-half the stock was subscribed and paid for. T. E. Stephenson took 119 shares, or $11,900.00 of the stock and in payment therefor he tendered the Heard lease which was appraised at $1,050.00, the Faulk lease appraised at $9,800.00, and "improvements on the leases above described, opening pits, clearing, digging test holes, getting out ties and purchase of tractor, appraised at $2,560.00."

J. A. Stephenson subscribed for $450.00 and Robert O. Randle for $600.00 of the stock. Whether they paid cash or whether they rendered services for their stock is not disclosed, but we think it probable that Randle, at least, rendered services for his stock, as he was an attorney and the charter seems to have been prepared in his office.

But it is clear that the only assets which the corporation had when it was organized was the property which T. E. Stephenson carried into it, in lieu of which stock was issued to him. The business under the corporation was Stephenson's business—he incorporated his business, and took charge of and continued the business as president and general manager. On the first pay day following the organization of the corporation, he, as man-

ager, for and in the name of the corporation, paid Mrs. Heard the amount due her under the contract and made like payments for thirty-three consecutive months, the total payments amounting to upwards of $7000.00.

Under such circumstances, the conclusion that this was a Stephenson organization and that the business of the corporation was but a continuation or a "reincarnation" of Stephenson's business under a new guise, is inescapable.

"With regard to liability for debts of the old corporation, the general rule is that a new corporation organized to succeed an old one is not liable for the debts of the latter. The new corporation, will, however, be liable for the debts of the old one (1) where the circumstances are such as to warrant the conclusion that the former is not a separate and distinct corporation, but merely a continuation of the latter, and hence the same person in law." 10 Cyc. 287.

In the case of Wolf vs. Shreveport Gas & Electric Light Co. et al., 138 La. 743, 70 South. 789, L. R. A. 1916B, No. 1138, where many authorities are cited, the court held that where a corporation makes a conveyance to a new corporation under circumstances which warrant the conclusion that the new company is merely a continuation or reorganization of the old company, a person who was injured in an explosion while working for the old company may recover against either, the evidence disclosing "the earmarks of transactions between persons dealing with themselves."

The rule applies with equal force where individuals are in business and incorporate and carry on the same business under the same management.

We think the defendant corporation is bound.

The only other point urged by counsel for defendant is that the lower court erred in refusing to permit them to recall certain witnesses in rebuttal.

The plaintiff offered in evidence the contract sued on, and the admission in defendant's answer, which made out a prima facie case.

Defendant then called its witnesses to show that the contract was obtained by Heard through error and fraud. Among the witnesses were Stephenson and Judge McLendon, who swore that Heard had nothing to do with the making of the contract. Plaintiff then called Heard, Sanders and others in rebuttal, and the case was ordered closed by the court. Counsel for defendant then asked to recall Judge McLendon and Stephenson to contradict the statements made by plaintiff's rebuttal witnesses, and the court refused to permit them to do so.

Counsel for defendant concede that the court followed the rule laid down in Articles 476 and 477 of the Code of Practice, but they say that the court may and should under some circumstances relax this rule, and they cite many decisions in support of their argument.

The matter of permitting witnesses to be called in surrebuttal is within the discretion of the trial court. The court did not abuse its discretion in this case. Judge McLendon and Stephenson had already been examined and cross-examined and had testified fully on all the main points. If they had been recalled they could have done no more than reiterate their former statements.

The judgment appealed from is affirmed, with costs in both courts.