147 So.2d 89 (1962)
Roosevelt BROWN, Jr., Plaintiff-Appellant,
v.
BENTON CREOSOTING CO., Inc., et al., Defendants-Appellees.
No. 9762.
Court of Appeal of Louisiana, Second Circuit.
October 26, 1962.
Rehearing Denied November 29, 1962.
Certiorari Denied January 14, 1963.
*90 Smallenberger, Eatman & Tooke, Brown & O'Hearn, Shreveport, for appellant.
Cook, Clark, Egan, Yancey & King, Shreveport, for appellees.
Before HARDY, AYRES and BOLIN, JJ.
AYRES, Judge.
This is an action under the workmen's compensation statute, LSA-R.S. 23:1021 et seq., wherein plaintiff seeks to recover the benefits as therein provided for total and permanent disability, together with penalties and attorney's fees. Recovery is sought not only against Benton Creosoting Co., Inc., as plaintiff's immediate employer, but against Kennedy Sawmills, Inc., as the principal of Benton Creosoting Co., Inc., or as its alter ego.
After trial, the court reached the conclusion that plaintiff had not sustained his demands as to his disability by a preponderance of the evidence, and, accordingly, plaintiff's demands were dismissed. From the judgment, plaintiff appealed.
The issues, factual in character, relate (1) to the nature of plaintiff's injuries and the extent and duration of disability resulting therefrom, and (2) to the liability of Kennedy Sawmills, Inc., because of its relationship to the Benton Creosoting Co., Inc.
Brief reference may be first made to the nature of plaintiff's employment and the manner of the occurrence of the accident in which he was allegedly injured. Plaintiff was employed as a "steamer" and as a "treater" of wood products, such as poles, *91 piling, and other timbers, in the process of creosoting them. As a "steamer," plaintiff's duties were to "fire" a marine-type boiler with natural gas, to maintain pressure therein at approximately 180 pounds, and to operate the necessary valves and machinery in connection therewith in drying the materials to be creosoted. As a "treater," plaintiff was charged with the duty of pressure-treating the materials with creosote. In the instant case, a cylinder 92 feet in length and six feet in diameter was used in the process. Materials were placed in the cylinder with approximately 15,000 pounds of creosote. The hatch, or door, at each end of the cylinder was then closed and sealed airtight. Through a manipulation of the valves, an air pressure of 60 pounds was developed inside the cylinder in order to pressure-treat the materials with creosote. Plaintiff's duties required the operation of boilers, valves, and machinery.
Plaintiff's injuries were sustained while performing his duties as a "steamer." While making an inspection for a leak in the boiler, a blowout occurred and plaintiff was burned by a blast of the burning gas.
Following the accident, plaintiff was carried to the clinic of Dr. S. G. Carrington, a general practitioner, in Benton, where, from a casual observation, it was ascertained that plaintiff had sustained fire burns to his face, shoulder, and hand. Sedatives and a narcotic were administered for the relief of pain, and, to soothe the burns, an ointment was applied. A more detailed examination was made the following day whereby it was discovered that plaintiff was, indeed, severely burned. An examination, at that time, revealed he had sustained first- and second-degree burns to his left arm, face, forehead, left ear, eyelids and lashes, and nose. Numerous blisters had developed. The burned areas on the left of plaintiff's forearm and on the upper arm were characterized by the doctor as large and raw.
In the meantime, plaintiff had developed a mild conjunctivitis in his eyes from the flash of the fire. For the treatment of this injury, plaintiff was referded to Dr. Louis A. Breffeilh, an ophthalmologist, whose examination confirmed Dr. Carrington's diagnosis.
Plaintiff continued under the care and treatment of Dr. Carrington from the date of the accident, May 12, 1960, until June 9, 1960. On the latter date, an examination revealed that the burns had healed, in the doctor's opinion, to such an extent that plaintiff could return to work. The doctor, however, was of the further opinion that plaintiff would experience, for an indeterminable period of time, sensitiveness or intolerance to sunlight and heat, which intolerance would cause discomfort. The use of a long-sleeved shirt as a shield was suggested.
Plaintiff was also examined by Dr. A. A. Herold, Jr., a general practitioner, on July 18, 1960, and May 1, 1961. On the occasion of his first examination, Dr. Herold ascertained that plaintiff had sustained severe burns characterized as second- or third-degree burns. Due to intolerance to heat experienced after such burns, the doctor was of the opinion plaintiff could not return to work. On the occasion of his second examination, Dr. Herold continued in the opinion that, although plaintiff had undergone considerable improvement through the healing process, he, nevertheless, was still unable to return to work. Due to the presence of intermingled nerve fibers in the scar tissue, Dr. Herold was of the further opinion that plaintiff would not be able to return to his work without extensive surgical procedure, and that his disability was probably permanent.
Dr. Lewell C. Butler, Jr., plastic surgeon, also examined plaintiff on the dates of July 26, 1960, and May 1, 1961. On those occasions, plaintiff's principal complaint was sensitiveness to the burned areas and intolerance to heat, particularly in those areas which had been deeply burned. Such intolerance was described as characteristic of deep burns and of scarring in the healing process. On the occasion of the first of the examinations, Dr. Butler anticipated *92 that surgery would be necessary before plaintiff would recover sufficiently to return to work. Later, however, after considering the risk involved in surgery, the doctor reached the conclusion that plaintiff should accept a moderate degree of disability rather than submit to surgery.
With reference to the permanency of plaintiff's condition. Dr. Butler testified:
"* * * the exact degree to which this heat intolerance will subside is very difficult to foresee. It may be permanent, and it may subside; and there appears to be no way of knowing which will happen."
From our review and appreciation of the testimony of the medical experts, and particularly that to which we have referred, plaintiff was unable, at the time of trial, because of the burns sustained by him, to return to and discharge the duties of his employment. The probable duration of such disability was not established. Hence, no definite conclusion can be reached as to when he may be able to return to his work and discharge his duties. This conclusion is predicated on a finding that, for some indefinite period of time, plaintiff will experience pain and discomfort because of sensitiveness and intolerance to heat and sunlight.
The general rule applicable to the aforesaid state of facts is that, where a claimant for workmen's compensation is shown to be totally disabled at the time of trial and the evidence is insufficient to determine the duration of disability, compensation should be awarded for the maximum period of time prescribed for permanent, total disability; as the courts will not indulge in conjecture or attempt to fix the number of weeks for which compensation shall be payable where it appears the injury will produce disability for an extended and indefinite period of time. Moore v. Great American Indemnity Company, La. App.2d Cir., 1958, 106 So.2d 771, 775; Powell v. Travelers Insurance Company, La.App.2d Cir., 1960, 117 So.2d 610, 616 (writs denied); Moody v. Red Ball Motor Freight, Inc., La.App.2d Cir., 1960, 119 So.2d 644, 645, 646 (writs denied).
Remaining for consideration is the question of liability, vel non, of Kennedy Sawmills, Inc., for workmen's compensation as claimed by Roosevelt Brown, Jr. The basis of plaintiff's claim in this regard is twofold: (1) that there existed a relationship of principal and agency between Kennedy Sawmills, Inc., and Benton Creosoting Co., Inc., and (2) that the former was merely and simply an alter ego of the other. These issues are factual in character and must be determined from the facts established in the record.
A history of Benton Creosoting Co., Inc., was recounted by a number of witnesses. A partnership under the name of Benton Creosoting Co. was organized in 1946 by D. E. Burchett and Max Henderson. During the course of its operation, the partners did business with Kennedy Sawmills, Inc., a wholesale lumber dealer. The products sold included creosoted products of the type manufactured by the partnership. Also, during the course of its operations, the partnership borrowed substantial amounts of money and obtained advances from Kennedy Sawmills, Inc. The indebtedness incurred was secured by mortgage on the assets of the partnership.
Henderson died November 14, 1952, leaving only collateral heirs, one of whom was a minor. Thus, at the time of Henderson's death, the partnership, as well as the individual partners, was indebted to Kennedy Sawmills, Inc., for considerable amounts, in evidence of which the partnership had issued its promissory notes aggregating the sum of $134,383.02, secured as aforesaid, by a mortgage on all the assets of the partnership. Because of his indebtedness, the Henderson heirs would not unconditionally accept his estate.
Burchett continued, however, to operate the partnership business until July 22, 1953, when an agreement was entered into by and between Kennedy Sawmills, Inc., John *93 E. Kennedy, Sr., its president, D. E. Burchett, and the major Henderson heirs, wherein it was agreed: (1) that the Henderson heirs accept his succession and acquire, by purchase, the interest of the minor heir; (2) that said major heirs and Burchett organize a corporation, to which would be transferred all the assets of the former partnership, to be appraised at $50,000.00, in exchange for 500 shares, at no par value, of the capital stock of the corporation; (3) that the corporation issue, to Kennedy Sawmills, Inc., a note representing the full amount of the indebtedness owed by the partnership to Kennedy Sawmills, Inc., and to John E. Kennedy, Sr., individually, which note would be secured by the pledge of two mortgage notes in the respective sums of $75,000.00 and $100,000.00, which were to be, in turn, secured by a mortgage on all the assets of the former partnership; (4) the entire capital stock of the corporation was to be likewise pledged to secure the aforesaid indebtedness, which pledge would carry, with it, the exclusive voting privileges of said stock; (5) Burchett and the Henderson heirs were to be relieved and released from their personal obligations for the payment of the partnership debts.
The terms of the agreement were carried out. The corporation was organized and the notes and mortgages were executed. These securities, together with the certificates of the capital stock of the corporation, were pledged to Kennedy Sawmills, Inc. Thereafter, Kennedy Sawmills, Inc., through its representative, John E. Kennedy, Jr., and through a manager retained in the service of the corporation, had complete control over the corporation's business and operations.
The corporation, however, virtually ceased, from its inception, to operate as a corporationno meetings of the shareholders or directors were held after the organizational proceedings were had. No bank account was maintained by the corporation, but all receipts, whether by check or cash, were remitted to and deposited in the account of Kennedy Sawmills, Inc. Invoices for materials sold instructed the purchasers to remit directly to Kennedy Sawmills, Inc. The books of the corporation were kept in the office of Kennedy Sawmills, Inc., whose checks paid the operating expenses of the corporation, for, as stated, the corporation maintained no bank account.
The receipts of the corporation, after their transmission to and deposit by Kennedy Sawmills, Inc., were purportedly credited to the indebtedness of the corporation. The disbursements made by Kennedy Sawmills, Inc., for and on behalf of the corporation, were added to its account on the books of Kennedy Sawmills, Inc. The capital stock certificates were kept in a lock-box of Kennedy's. The indebtedness never decreased but constantly increased.
The funds of the corporation and Kennedy Sawmills, Inc., were completely commingled. One endorsement stamp served the purpose of endorsing all checks for deposit, whether received in the name of John E. Kennedy, Kennedy Wood Farms, Kennedy Supply Company, Inc., Kennedy Sawmills, Inc., or Benton Creosoting Co., Inc. The business of the corporation approximated one-fourth of all the business of the Kennedy interests cleared through the Kennedy bank account. The checks in payment of two weeks' compensation due plaintiff were drawn upon and paid by Kennedy Sawmills, Inc.
None of the purported owners or stockholders in the corporation was ever consulted about the operation of the business. Burchett, as a nominal owner of 50% of the capital stock of the corporation, had not been to the plant in years, and did not consider that he had an interest in it.
The conclusion is, therefore, inescapable that Kennedy Sawmills, Inc., is the mere alter ego of Benton Creosoting Co., Inc. Keller v. Haas, 202 La. 486, 12 So.2d 238; Lindstrom v. Sauer, La.App. Orleans, 1936, 166 So. 636; Mayo v. Pioneer Bank & Trust Company, U.S.C.A. 5th Cir., La., 1960, 274 F.2d 320. The effect of the *94 arrangement was to place Kennedy Sawmills, Inc., in possession as owner and operator of the business purportedly conducted under the name of Benton Creosoting Co., Inc. The result was that the business conducted was that of Kennedy Sawmills, Inc., over which it had full management and entire control. Under such circumstances, Kennedy Sawmills, Inc., is not permitted to cloak itself behind the corporate entity of Benton Creosoting Co., Inc., to shield itself from responsibility. Kennedy Sawmills, Inc., is, therefore, bound to the same extent that Benton Creosoting Co., Inc., itself is bound. As was stated in Keller v. Haas, supra:
"It is well settled that where an individual forms a corporation of which he is the sole and only stockholder or owns such control of the stock that the act of the corporation is his own, then he may not use the screen of corporate entity to absolve himself from responsibility. Lindstrom v. Sauer, La.App., 166 So. 636; Alliance Trust Co. v. Streater, 182 La. 102, 161 So. 168; Superior Oil Co. v. Baltar, 181 La. 908, 160 So. 626; Wilson v. Lagasse, 12 La.App. 704, 127 So. 17; Heard v. Monroe Sand & Gravel Co., 9 La.App. 568, 121 So. 642; State v. F. B. Williams Cypress Co., 131 La. 62, 58 So. 1033."
In the case of Mayo v. Pioneer Bank & Trust Company, supra, the court stated:
"* * * The corporation law of Louisiana is no different from the corporation law of all the other states in general recognition of a corporation as a separate entityfor purposes of convenience and to serve the ends of justice. But when the corporate fiction is a mere simulacrum, an alter ego or business conduit of an individual, it may be disregarded in the interest of securing a just determination of the action. See 13 Am.Jur., Corporations, § 7; 1 Fletcher Cyclopedia Corporations § 41 (1931); Latty, The Corporate Entity as a Solvent of Legal Problems, 34 Mich.L.Rev. 599 (1936), to cite just one of many law review articles on the subject; the cases collected in the annotations, 1 A.L.R. 610, 34 A.L.R. 597, 63 A.L.R.2d 1051; and, Keller v. Haas, 1943, 202 La. 486, 12 So.2d 238 and Lindstrom v. Sauer, La. App.1936, 166 So. 636, to cite but two Louisiana cases for the general principle involved. Here especially, when the Court is exercising the traditional equity powers of a court of bankruptcy, we will not permit justice to be frustrated by a fiction that in this case defies common sense and has ceased to have value as a convenient legal tool subserving justice."
Moreover, considering the facts from a standpoint most favorable to the defendant, Kennedy Sawmills, Inc., a relationship, at least, of principal and contractor was established to have existed between it and Benton Creosoting Co., Inc., as the latter was barely the agent or employee of the former in conducting and carrying on the business of the former. Such a relationship affords no relief to this defendant, for, under the workmen's compensation statute, LSA-R.S. 23:1061 and 23:1062, both principal and contractor are liable to employees for workmen's compensation.
Finally, plaintiff insists on an award of penalties and attorney's fees. Such penalties are allowed only when the payment of compensation is terminated or when compensation has not been paid, where the basis for such action is arbitrary, capricious, or with probable cause. From our review of the record, we cannot conclude that defendant's actions were not in good faith. Plaintiff's treating physician had advised that plaintiff was able to resume his employment. No showing is made why defendants should not have relied upon that advice.
Mention must be made of the weekly compensation to which plaintiff is entitled. Plaintiff's wages were computed on an 8-hour day at $1.00 per hour. A 6-day week *95 is to be employed in calculating his weekly wages. Hoffman v. City of New Orleans, 240 La. 943, 125 So.2d 774; Carrington v. Consolidated Underwriters, 230 La. 939, 89 So.2d 399, 404; Rylander v. T. Smith & Son, Inc., 177 La. 716, 149 So. 434, 435. The compensation payable is therefore $31.20 per week.
Accordingly, for the reasons herein assigned, the judgment appealed is annulled, avoided, reversed, and set aside; and
It is now Ordered, Adjudged, and Decreed there be judgment herein in favor of the plaintiff, Roosevelt Brown, Jr., and against the defendants, Benton Creosoting Co., Inc., and Kennedy Sawmills, Inc., in solido, for the full sum and weekly compensation of $31.20 beginning May 19, 1960, and continuing during plaintiff's disability, not, however, to exceed 400 weeks, with legal interest on each of said weekly installments from its maturity until paid, and for all costs of this suit, including the cost of this appeal, less and except $52.00 heretofore paid.
Reversed and rendered.