466 So.2d 1309 (1985)
Gregory HARRIS
v.
BEST OF AMERICA INC. and Jerry A. Blessing.
No. 84 CA 0077.
Court of Appeal of Louisiana, First Circuit.
February 26, 1985.
Rehearing Denied April 12, 1985.
Writ Denied June 7, 1985.
*1310 Sondra Cheek, Bogalusa, for plaintiff.
Richard Machen, Slidell, Levy, Oubre & Rosenthal, and Bryan Pedeaux, New Orleans, for defendants-appellants.
Before COLE, CARTER and LANIER, JJ.
CARTER, Judge.
This is an appeal from the trial court's determination that plaintiff, Gregory Harris, was entitled to recover from Best of America, Inc. (Best) and Jerry A. Blessing certain damages for faulty work under a construction contract.
On November 25, 1981, Gregory E. Harris and Best, through its president, Jerry A. Blessing, entered into a contract for the construction of a two-bay car wash located in Washington Parish. On April 7, 1982, Harris filed suit against Best and Blessing alleging that the car wash was unfit for the use for which it was intended and demanding return of the price paid, costs of repairs, loss of income, attorney fees, damages for inconvenience and distress, as well as judgment in solido against Best and Blessing.
Defendants reconvened for $3,792.14 due and owing under the construction contract and for damages to reputation.
After trial, the trial judge rendered judgment in favor of plaintiff and against defendants *1311 for $38,000.00 to repair defects in the facility, plus lost revenue of $60.00 per day for the thirty days necessary to make the repairs. In addition, the plaintiff was awarded $200.00 for each of his experts, plus the entire cost of the services rendered by the experts. The defendants were awarded $3,792.14 plus legal interest from date of judicial demand. The court further found that Best was, in fact, the alter ego of Jerry A. Blessing and rendered judgment against Best and Blessing jointly, severally, and in solido.
Defendants appeal, alleging three assignments of error: (1) the trial court should have awarded only the damages set forth in the contract; (2) the court should not have relied solely on the testimony of the plaintiff's experts; and, (3) the court should not have ruled that Best was the alter ego of Blessing and pierced the corporate veil.

ASSIGNMENT OF ERROR NO. 1
In this assignment of error, the defendants contend that there were stipulated damages provided in paragraph five of the contract and that these were the only damages that could have properly been awarded the plaintiff.
Under the contract, construction was to commence on or about November 30, 1981, and was to be completed on or before December 31, 1981. This was to be a "turn key" project, i.e., Best was to build a car wash facility completely ready for operation by December 31, 1981, in return for $60,000.00.
A formal acceptance of performance of the contract was signed by Harris on December 31, 1981. Approximately one month later, Harris discovered defective workmanship in the form of cracks in the drain pits and the concrete driveways.
Plaintiff testified that when he began negotiating with Best for construction of a car wash, Best showed him a set of plans and used them as a selling point throughout the negotiations. These plans were paraphed for identification with the contract.[1] According to paragraph two of the contract, the car wash was to be built in strict accordance with these plans. Plaintiff submitted these plans to his bank to obtain project financing.
At trial, defendants argued that they never agreed to build the car wash strictly according to the plans. On appeal, however, defendants concede that the car wash failed to meet the specifications as provided in the building plans. They argue that this failure triggered the provisions of paragraph five, which defendants contend provide two mutually exclusive penalties: (1) $6,000.00 for failure to complete the job according to specifications; or (2) $200.00 per day for failure to complete the facility by December 31, 1981.
Defendants contend the car wash was completed by December 31, 1981, as evidenced by Harris' formal acceptance, therefore, only a flat payment of $6,000.00 is applicable regardless of the amount of actual damages. We disagree.
Paragraph five of the contract provides:
In the event contractor fails to deliver completed structure, as set forth above, Contractor agreed to pay to Owner the amount of $6,000.00, as stipulated damages, in addition to the amount of $200.00 per day until completion of said structure and acceptance by owner thereof. (Emphasis added)
Defendants' reliance on paragraph five is misplaced. Clearly, the phrase "as set forth above" refers to paragraph four and stipulates damages for non-delivery of a "turn key" car wash by a specific date (December 31, 1981).[2] The *1312 car wash was delivered and accepted on December 31,1981. Therefore, the penalty clause became inapplicable after that time.
Upon the subsequent discovery of defects in the facility, the applicable law is set forth in LSA-C.C. art. 2756 et seq., and more specifically articles 2762 and 2769.
LSA-C.C. art. 2762 provides:
If a building, which an architect or other workman has undertaken to make by the job, should fall to ruin either in whole or in part, on account of the badness of the workmanship, the architect or undertaker shall bear the loss if the building falls to ruin in the course of ten years, if it be a stone or brick building, and of five years if it be built in wood or with frames filled with bricks.
This article comprehends both the use of faulty materials and defective workmanship. Manzanares v. American Intern. Forest, 389 So.2d 1142 (La.App. 3rd Cir. 1980), writ denied, 395 So.2d 811 (La.1980); Parker v. Brown, 150 So.2d 306 (La.App. 2nd Cir.1963).
LSA-C.C. art. 2769 provides:
If an undertaker fails to do the work he has contracted to do, or if he does not execute it in the manner and at the time he has agreed to do it, he shall be liable in damages for the losses that may ensue from his non-compliance with his contract.
This article sets forth the duty of a contractor to execute the work contracted for in a proper manner.
It is well settled that a contractor is bound to warrant his work and is responsible for any damages caused by defective workmanship. Even had this contract not specifically so provided, it would have been implied that the work would be performed in a good, workmanlike manner. Davidge v. H & H Const. Co., 432 So.2d 393 (La. App. 1st Cir.1983); Troy v. Bretz, 399 So.2d 667 (La.App. 1st Cir.1981).
Defendants were properly cast in judgment for repairs proven by the plaintiff to be necessary to correct the defendants' defective workmanship, and this assignment of error is without merit.

ASSIGNMENT OF ERROR NO. 2
In this assignment of error, the defendants argue that the trial court should not have relied solely on the testimony of plaintiff's experts in determining the award of damages.
In proving the extent of the damages, plaintiff called two expert witnesses, namely James Aronstein and Lamon Moody.
James Aronstein testified as an expert in the field of geotechnical engineering (soils and foundations). He stated that the plans called for the soil to be compacted to 95%, but his tests revealed a compaction of only 60-86%. In this state, Aronstein opined that the soil would have a low bearing capacity and would likely settle. In turn, this settlement would lead to cracks in the concrete.
*1313 In assessing the construction of the drain pits, Aronstein stated that the plans called for the pits to be poured in place with four-inch concrete sides with one-half inch steel reinforcing bars on twelve-inch centers. The bottom slab of the pit was to be tied in with the pit walls, and the entire pit was to be tied into the floor of the car wash and protected with a visqueen water barrier. His inspection of the pits showed that they were prefabricated rather than poured in place. The pit walls were only one and a half to two and a half inches thick with no reinforcing steel and no water barrier. Additionally, the concrete tested at 1500 pounds per square inch (psi) versus the 4000 psi specified. Furthermore, the pit was not tied into the car wash floor and the pit area was over-excavated. He found voids ranging from fifteen inches to over thirty inches under the pit floor and large cracks between the car wash floor and the top of the pit. Aronstein testified that the pit was not fit for its intended purpose.
Aronstein also found that the concrete compressive strength of the driveways tested out to 3000-3500 psi whereas the plans specified 4000 psi. Aronstein felt that this strength deficiency could lead to concrete failure.
Additionally, Aronstein found that borings of the car wash floor showed that the wire mesh reinforcement was located on the bottom of the slab whereas the specifications required that it be in the slab center. The wire mesh gives the concrete additional tensile strength to reduce cracking, and Aronstein was of the opinion that in its present location, the wire was not functional.
Mr. Lamon Moody testified as an expert in the fields of consulting engineering and civil structural engineering. He examined the invoices and delivery tickets from the concrete company and stated that the highest strength concrete delivered was 3000 psi and some loads were only 2500 psi. He stated that the drain pits did not in any way resemble the design specifications and that there had been extensive concrete failure in the pit walls.
Furthermore, Moody found that all three borings in the driveway and floor showed that the wire mesh reinforcement was on the bottom of the slab, making the wire totally ineffective. The borings also revealed voids under the concrete driveways. Employing various measuring devices, Moody made a careful and detailed analysis over an extended period of time of numerous cracks and determined they were "shear cracks", which run completely through the slab and indicate complete concrete failure. He stated that the concrete could fail beneath the wheels of a vehicle, causing shear cracks to radiate underneath the brick walls of the car wash, causing them to collapse. Moody was of the opinion that as presently constructed, there was a "drastic deviation from the design drawings" and that the car wash could not be used for the purpose for which it was intended.
As an alternative to the complete razing of the structure, Moody stated that it would be possible to use concrete saws to cut the slabs in the two bays away from the building foundation, and then remove the entire floor area, including the pits, which could be removed safely with jackhammers. The concrete could then be repoured properly. He estimated this would cost $35,000.00 plus $3,000.00 for soil tests. The entire operation would take approximately seven weeks. He recommended that a full-time inspector be employed during the repair work at an estimated cost of an additional $5,000.00.
Defendants' expert, Mr. Herbert C. Sanders, testified as an expert on concrete slabs. He stated that he made an inspection trip to the car wash and that he was unsure of what to look for because he had not been informed of the specifics of plaintiff's complaint. Nevertheless, he visually examined the pits and the cracks in the slab. In his opinion, the cracks were thermal in nature, that is, they did not go all the way through the slab and thus did not indicate slab failure. However, he admitted he used no measuring devices in reaching his conclusion. He also admitted that the voids under the pits and driveway were *1314 totally unacceptable. He stated that 3000 psi concrete could be sufficient for a car wash, but that proper compaction of the soil base was very important if 3000 psi concrete was employed. He observed that the wire mesh was on the bottom of the slab in at least one location and that, to be effective, it should be approximately at the midpoint of the slab.
The weight which the trial court gives to the testimony of an expert witness is determined by the qualifications, the field experience, and the facts upon which his opinion is based. The trial judge has considerable discretion in accepting or rejecting expert testimony. Ford v. Dixie Buick, Inc., 400 So.2d 228 (La.App. 4th Cir.1981). Additionally, the trial court need not accept all of the testimony of any witness as being either true or false and may believe and accept a part or parts of a witness' testimony and refuse to accept any part or parts thereof. Veals v. Manis, 437 So.2d 359 (La.App. 4th Cir.1983), writ denied, 441 So.2d 1222 (La.1983); Holmes v. Southeastern Fidelity Ins. Co., 422 So.2d 1200 (La.App. 1st Cir.1982), writ denied, 429 So.2d 133 (La.1983). The factual conclusions arrived at by the trier of fact must be given great weight and should not be reversed unless clearly wrong. Arceneaux v. Domingue, 365 So.3d 1330 (La. 1978).
We have reviewed the entire record, including the trial judge's written reasons for judgment, and conclude that his factual findings are not manifestly erroneous.
This assignment of error is without merit.

ASSIGNMENT OF ERROR NO. 3
In their final assignment of error, defendants contend that the trial judge erred in ruling that Best was the alter ego of Blessing and holding Blessing liable in solido with Best.
A corporation is an entity distinct from all the members who compose it. LSA-C.C. art. 435[3]. The estates and rights of a corporation belong exclusively to the corporation and not to its members. LSA-C.C. art. 436[4].
As a general rule, individual shareholders are not liable for the debts of the corporation. LSA-C.C. art. 437[5]. However, there are limited exceptions to the rule of non-liability of shareholders for the debts of a corporation whereby the court may ignore the corporate fiction and hold the individual liable. In such situations, a litigant can reach an individual shareholder by "piercing the corporate veil," thereby rendering the individual liable for the debts incurred by the corporation. Liberto v. Villard, 386 So.2d 930 (La.App. 3rd Cir.1980).
One such exception to the non-liability rule involves situations where fraud or deceit has been practiced on a third party by *1315 the shareholder acting through the corporation. LSA-R.S. 12:95; Kingsman Enterprises v. Bakerfield Elec. Co., 339 So.2d 1280 (La.App. 1st Cir.1976); Dillman v. Nobles, 351 So.2d 210 (La.App. 4th Cir. 1977); Bossier Millwork & Supply Co. v. D. & R. Const. Co., 245 So.2d 414 (La.App. 2nd Cir.1971).
In the case sub judice, there are no allegations of fraud and deceit. Plaintiff knew from the beginning that he was contracting and dealing with the corporation and not with Blessing personally.
The corporate veil may be pierced, even in the absence of fraud, where there has been a disregard of the corporate entity to such an extent that the corporation is indistinguishable from the shareholders. Cahn Elec. Appliance Co., Inc. v. Harper, 430 So.2d 143 (La.App. 2nd Cir.1983); Smith-Hearron v. Frazier, Inc., 352 So.2d 263 (La.App. 2nd Cir.1977), writ denied, 353 So.2d 1337 (La.1978); Dillman v. Nobles, supra. See also Brown v. Benton Creosoting Co., 147 So.2d 89 (La.App. 2nd Cir.1962); Keller v. Haas, 202 La. 486, 12 So.2d 238 (1943), affirmed 209 La. 343, 24 So.2d 610 (1945). When the members fail to conduct a corporation on a separate footing, the court may ignore the corporate entity and hold individual members liable to third parties. In such a situation, the corporation is referred to as the "alter ego" of its members. Union Local P-1476, Etc. v. Union, Etc., 408 So.2d 371 (La.App. 1st Cir.1981); Kingsman Enterprises v. Bakerfield Elec. Co., supra.
However, where fraud or deceit is absent, other circumstances must be so strong as to clearly indicate that the corporation and shareholder operated as one. Kingsman Enterprises v. Bakerfield Elec. Co., supra; Cahn Elec. Appliance Co., Inc. v. Harper, supra.
When a party seeks to pierce the corporate veil, the situation must be viewed with regard to the totality of the circumstances in each case. Kingsman Enterprises v. Bakerfield Elec Co., supra; Liberto v. Villard, supra. Because Louisiana considers the concept of the corporation beneficial, the principle that the corporation is a separate entity should be disregarded only in exceptional circumstances. Kingsman Enterprises v. Bakerfield Elec. Co., supra; Cahn Elec. Appliance Co., Inc. v. Harper, supra; Liberto v. Villard, supra.
Louisiana courts have listed circumstances which justify the imposition of the doctrine as follows:
(1) Commingling of corporate and shareholder funds;
(2) Failure to follow statutory formalities required for incorporation and for the transaction of corporate affairs;
(3) Undercapitalization;
(4) Failure to provide separate bank accounts and bookkeeping records; and
(5) Failure to hold regular shareholder or director meetings.
Kingsman Enterprises v. Bakerfield Elec. Co., supra; Smith-Hearron v. Frazier, Inc., supra.
In the case sub judice, the trial judge found that Blessing failed to conduct Best on a corporation footing to the extent that the corporation ceased to be separate from Blessing. The trial judge determined that since Best declared a loss on its last IRS tax return while paying its president and primary, if not only, shareholder an annual salary of $100,000.00, Best was not adequately capitalized. The trial judge also determined that Best had held an insufficient number of board meetings. Based upon these findings, the trial judge pierced the corporate veil and cast Blessing in judgment solidarily with Best.
Plaintiff contends that Blessing's personal funds were commingled with Best's corporate funds, thus demonstrating that the corporate identity was ignored. Plaintiff reasons that the rule of shareholder non-liability should be circumvented on the basis of an entry on the corporate tax return reflecting as an asset $32,841.00 due from a stockholder (presumably Blessing).
However, it is clear from the record that separate banking accounts were maintained by Best and Blessing. Additionally, the questioned fund transfers *1316 in the instant case were explained as loan transactions.[6] Such circumstances do not demonstrate a commingling of corporate funds with the funds of the individual, thereby destroying the separate identities of the entities. See Kingsman Enterprises v. Bakerfield Elec. Co., supra.
Plaintiff also contends that Best did not hold a sufficient number of board of director meetings.
LSA-R.S. 12:81 discusses the role of directors in Louisiana corporations law; and there is no requisite number of meetings a corporation's board must have to maintain their corporate status. The evidence clearly shows that Best became incorporated in January, 1980. Furthermore, a copy of the minutes of a January 13,1980 board meeting and an excerpt from the minutes of a November, 1981 special board meeting were made part of the record.[7] We cannot say that two board meetings in two years is an insufficient number of meetings, which justifies piercing the corporate veil.
Plaintiff further contends that Best is undercapitalized. Plaintiff points out that Best's 1981 federal tax return shows capital of $200.00, while gross receipts for the year totalled over $1,200,000.00, and that the tax return showed a loss, yet the corporation paid Blessing over $100,000.00 in salary for the year. Plaintiff reasons that these facts demonstrate that Best was undercapitalized and support the trial judge's finding that Blessing was the corporation's "alter ego."
The law specifically authorizes the establishment of a corporation by a sole stockholder and individuals are specifically authorized to assume only limited liability by setting up a minimally capitalized corporation. Cahn Elec. Appliance Co., Inc. v. Harper, supra; Abraham v. Lake Forest, Inc., 377 So.2d 465 (La.App. 4th Cir.1979), writs denied 380 So.2d 99, 100 (La.1980). Furthermore, Best stock had no par value, which is permissible under LSA-R.S. 12:61(A), and the consideration received upon initial issuance of these shares was apparently allocated to stated capital[8].
Plaintiff had the heavy burden of producing clear and convincing evidence to show that Blessing was the "alter ego" of Best. The factors cited by plaintiff are not frequent, serious, or exceptional so as to warrant piercing the corporate veil to hold Blessing liable on Best's contract with plaintiff. Cf. Hight Enterprises v. Smith and Johnson, 421 So.2d 267 (La.App. 4th Cir.1982), writ denied 427 So.2d 1206 (La. 1983).
The totality of facts in the instant case does not support a finding that the corporation had ceased to exist as an entity, separate and distinct from its sole shareholder. Although Blessing, in his testimony, exhibited limited, if not incorrect, knowledge of the intricacies of his corporation, the evidence clearly establishes that Best operated as a legal entity distinct from its shareholder, Blessing. Best had been an active sales company for almost two years with a recognizable identity, although the contract in the instant case was Best's first attempt at construction. In fact, it is evident from the record that plaintiff was familiar with Best and never doubted he was dealing with the corporation and not Blessing personally. Further, the corporation and Blessing maintained separate bank accounts. Transactions between the corporation and Blessing were documented so as to maintain the separate *1317 identity of the funds. Board meetings were conducted, one in fact specifically for obtaining authority by board resolution to enter into the construction contract with plaintiff. The totality of facts pointed out by plaintiff fails to justify the contravention of the rule of shareholder non-liability for corporation debts, and the trial judge erred in "piercing the corporate veil" and in holding Blessing solidarily liable with Best for the debt.

CONCLUSION
For the above reasons, the judgment of the trial court is affirmed, except that portion of the judgment casting Jerry A. Blessing liable solidarily with Best, which is reversed. Costs of this appeal are to be equally divided between plaintiff and defendant Best.
AFFIRMED IN PART; REVERSED IN PART.
NOTES
[1] Although the plans and specifications were paraphed with the contract, they were not made a part of the record.
[2] The contract provides in pertinent part as follows:

1. Contractor does hereby agree with Owner to erect and finish, in accordance with the conditions set forth, in a perfect and workmanlike manner, and to deliver to owner, free from all claims or liens, a commercial building, on the property belonging to Owner, and being more particularly described as follows:
[property description omitted]
2. Said work is to be done in strict accordance with the draings (sic) and specifications which I, Notary, have paraphed for identification with this contract and which shall be correlative, without any change whatsoever, it being understood that the terms and conditions of this contract shall prevail should there be any conflict between it and the specifications or other documentation.
3. No new work of any description, or any work of any kind whatsoever shall be considered as extra, unless a separate estimate in writing for the same shall have been submitted by contractor before its commencement and the consent of the owner obtained thereto in writing.
4. Contractor is to furnish all labor, tools, equipment, materials, appliances, scaffolding, and cartage of every description necessary to do said work, which shall commence on or about November 30, 1981, and deliver the work free from all liens and all claims for labor and material, in perfect repair, broom clean and in good condition and complete on or before December 31, 1981.
5. In the event contractor fails to deliver completed structure, as set forth above, Contractor agreed to pay to Owner the amount of $6,000.00, as stipulated damages, in addition to the amount of $200.00 per day until completion of said structure and acceptance by owner thereof.
6. All of said work to be performed for the price and sum of $60,000.00.... (Emphasis added)
[3] LSA-C.C. art. 435 provides:

Corporations are intellectual beings, different and distinct from all the persons who compose them.
[4] LSA-C.C. art. 436 provides:

The estate and rights of a corporation belong so completely to the body, that none of the individuals who compose it, can dispose of any part of them.
In this respect the thing belonging to a body, is very different from a thing which is common to several individuals, as respects the share which every one has in the partnership which exists between them.
[5] LSA-C.C. art. 437 provides:

According to the above rule, what is due to a corporation is not due to any of the individuals who compose it, and vice versa.
A creditor of a corporation can not therefore compel any of the members thereof to pay what may be due to him by the corporation; he can demand his payment of the corporation only, through their president, syndic or attorney in fact, and he can seize no other effects but such as belong to the corporation, provided the debt has been contracted by the corporation through their president, syndic, or attorney in fact; for if all the individuals who compose the corporation have signed the deed personally, every one of them may be compelled to make payment, either for his individual portion or in solidum, when it has been stipulated expressly that the debt was contracted in solidum.
[6] In his testimony, Blessing denied that there were any loans made to him, but the documents introduced into evidence clearly show that the questioned funds had been a loan to Blessing by the corporation.
[7] In his testimony, Blessing testified he was unaware of any meeting of the board of directors subsequent to the inception of the corporation. However, an excerpt from the minutes of the board of directors dated November, 1981, clearly demonstrates that the corporation's governing body acted to give Blessing authority to contract, on behalf of the corporation, with Harris.
[8] Although Blessing testified at trial that the capitalization was $10,000.00 and that he and his wife each owned 5,000 shares, the documents of record clearly demonstrate that the stated capital was $100.00 and that Blessing only received 100 shares.