577 So.2d 1060 (1991)
William S. RIGGINS and Patricia G. Riggins
v.
DIXIE SHORING COMPANY, INC., et al.
No. 90-CA-0252.
Court of Appeal of Louisiana, Fourth Circuit.
March 28, 1991.
Writ Granted June 21, 1991.
*1061 Caleb H. Didriksen, Didriksen & Carbo, and Thomas J. Andre, Jr., New Orleans, for plaintiffs, appellees.
Veronica E. Henry, Wilkerson, Henry & Perez, and Kern A. Reese, New Orleans, for defendant, appellant.
Before WARD, ARMSTRONG and BECKER, JJ.
BECKER, Judge.
Defendants, O.P. Bajoie and Reginald Bajoie, appeal the judgment of the trial court which pierced the corporate entity, Dixie Shoring Company, Inc., and found them individually liable to the plaintiffs for damages incurred when plaintiffs' home was negligently levelled.
Plaintiffs, William G. Riggins and Patricia G. Riggins, contracted with Dixie Shoring Company, Inc., in November 1985 to have their house at 3066 Hyman Place, New Orleans, Louisiana levelled. The south side of the house had sunk slightly due to subsidence in the area. O.P. Bajoie, who represented himself as president and owner of Dixie Shoring Company, negotiated and signed the contract.
Work was begun on the house on November 18, 1985. Plaintiffs were to pay the defendants in three installments; (1) at the beginning of the work; (2) when the house was to be levelled; and (3) upon completion of the job. When Mr. Riggins went to write out a check for the first payment, O.P. Bajoie requested that the check be made out to himself individually instead of Dixie Shoring Company, Inc. In December, 1985, Reginald Bajoie approached Mr. Riggins for the second installment. Reginald Bajoie also requested that the check be made out to himself individually rather than Dixie Shoring Company, Inc. Mr. Riggins refused to comply with this request until he received approval from O.P. Bajoie. Both O.P. Bajoie and Reginald Bajoie testified that they made such requests so that the checks could be cashed and used for cash disbursements of the company.
In January 1986, plaintiffs became dissatisfied with defendants' work on the house. In particular, plaintiffs argued that the house was improperly levelled causing major cracking in the foundation, and the exterior and interior of the house. The plaintiffs refused to pay defendants the final installment and instituted suit to recover damages allegedly incurred from the negligent and improper levelling of the house.
Plaintiffs originally named Dixie Shoring Company, Inc. only as defendant in the suit. During the pendency of the litigation, Dixie Shoring Company, Inc. filed bankruptcy pleadings in federal court.[1] The plaintiffs then amended the suit to include O.P. Bajoie and Reginald Bajoie as defendants. Plaintiff filed a second supplemental and amending petition naming Julie Bajoie, the then wife of O.P. Bajoie, as a defendant, alleging that she was a shareholder of the corporation at the time Dixie Shoring Company, Inc. and plaintiffs entered their agreement.
*1062 After a trial on the merits, the trial court dismissed plaintiffs' claims against Julie Bajoie. The trial court did find O.P. Bajoie and Reginald Bajoie individually liable to the plaintiffs, piercing the corporate veil of Dixie Shoring Company, Inc., and awarded plaintiffs damages of $51,000.00. The trial court, in its reasons for judgment, found that several factors mitigated in favor of ignoring the corporate entity, Dixie Shoring Company, Inc., namely:
"(1) One of the now former employees of DSC [Dixie Shoring Company, Inc.] indicated that he was paid in cash over and above his payroll check; apparently no records of the payments were made.
(2) Checks totalling $6,066.00 were written by William S. Riggins (W.S.R.) to either O.P. Bajoie ("OPB") or OPB's son, Reginald Bajoie ("RB"), individually (rather than DSC), both of whom cashed the checks. The money did not reach DSC's corporate books but was instead kept in a safe in the DSC office. How those funds were expended is not readily ascertainable from the record although the Bajoies maintain that the monies were used for out-of-pocket expenditures in connection with DSC's business. No cash disbursement journal was kept with respect to these cash funds, and the Court finds that some of the funds were converted to OPB's and RB's personal purposes.
(3) No corporate minutes were kept.
(4) Movable and immovable property belonging to OPB individually was used by the DSC without compensation to OPB for the use.
(5) In excess of $100,000.00 of corporate (DSC) assets disappeared without explanation by OPB and RB between the end of DSC's last fiscal year for tax purposes (1986) prior to bankruptcy and the date of the filing of the DSC petition in bankruptcy.
(6) A former employee of DSC and now an "independent contractor" regularly working with a successor corporation by OPB of a substantially similar name (Dixie Construction Company, Inc. ["DCC"]) testifies that the same equipment formerly used in DSC's business is now used by DCC. A truck titled in DSC's name is now used by DCC and OPB.
(7) Disbursements were made to employees without complete back-up documentation.
(8) After the bankruptcy of DSC, DCC maintained the same telephone number of DSC, and continued operating the same business as DSC.
(9) OPB and RB have failed to show that DSC made deposits of cash money (from the checks payable to OPB and RB and cashed by them) into the two corporate checking accounts maintained by DSC.
(10) Terminologial inexactitudes testified to by OPB and RB regarding how cash was handled." (Footnotes omitted).
The trial court also indicated that there were factors which suggested the corporate veil of Dixie Shoring Company, Inc. not be pierced:
(1) For many years DSC operated under the corporate name.
(2) DSC maintained corporate checking accounts and filed tax returns under the corporate name.
(3) DSC showed profits in the corporation upon which DSC paid federal income taxes in various years.
(4) DSC filed appropriate tax and reporting forms with the Internal Revenue Service, the Louisiana Department of Revenue and Taxation, and the Louisiana Office of Employment Security.
(5) WSR testifies that he understood that he was dealing with the corporate entity, DSC, not OPB or RB individually in connection with the jacking of his dwelling.
(6) OPB held informal meetings with RB about business operations which amounted to a form of meetings of the Board of Directors. See Chaney v. Godfrey, 535 So.2d 918 (La.App. 2nd Cir.1988).
(7) DSC was initially properly incorporated under the laws of Louisiana.
(8) DSC had $280,403.00 of gross receipts for 1985 and $251,963.00 of gross receipts in 1986.
(9) Checking accounts were maintained with the Hibernia National Bank and the *1063 First National Bank of Commerce in the corporate names from which significant corporate disbursements were made.
(10) Substantial sums of money were maintained in the DSC corporate checking accounts during the period of time that work on the Riggins' house was being performed."
The trial court further found that Reginald Bajoie acted "beyond a mere employee of DSC and acted personally and periodically as the alter ego of DSC. Although he was paid a salary and appropriate W-2 and Louisiana Office of Employment Security forms showing his salary status were filed, he periodically converted corporate assets to his own use." O.P. Bajoie "represented to WSR [William S. Riggins] that he was the expert and the power behind DSC; like his son he converted funds to his own use and used corporate assets and opportunities for his own personal purposes."
The trial court thus concluded that "[t]he totality of the testimony, documentary evidence and pleadings establishes ... that the plaintiffs have made sufficient allegations in the first supplemental and amending petition (even though no specific allegation of fraud is made) that the corporate entity of DSC should properly be ignored."
In awarding plaintiffs $51,000.00 in damages, the trial court found that O.P. Bajoie
"had superior knowledge to that of WSR as to how the house should have been jacked and leveled. The Court finds that OPB failed to properly apprise WSR of the dangers in jacking his house without internal piers and that he allowed the jacking of the Riggins's dwelling in an improper manner and failed to take the necessary precautions or properly supervise to insure that the slab of the Riggins's dwelling would not crack during the jacking process. The Court specifically finds that the jacking process cracked the slab of the Riggins's dwelling and that the work was performed in an improper, unworkmanlike manner; the jacking was negligently performed. Implicit in every contract is an implied warranty by the contractor that he will perform the work in a good, careful and workman like manner. The Court finds that such was not done in this particular case because the testimony established that representations were made that no jacking would occur without OPB or RB being present, yet an employee jacked the house without either of them being present. The Court finds that the slab crack occurred when one of the jacks failed to rise as the house was jacked by an unsupervised employee. A single jack at the corner of the house rose ahead of other jacks which caused the slab to break."
On appeal, defendants, O.P. Bajoie and Reginald Bajoie argue that (1) the trial court erred in piercing the corporate veil; (2) assuming the corporate veil was appropriately pierced, the trial court erred in finding liability on the part of Reginald Bajoie, only an employee of corporation, owning no stock; and (3) the trial court erred in awarding damages which were inconsistent with the evidence.
As a general rule, corporations are distinct legal entities and their shareholders are not liable for debts of the corporation. However, there are limited exceptions to the rule of non-liability of shareholders for the debts of a corporation whereby the court may ignore the corporate fiction and hold the individual members or member liable. In such situations courts commonly refer to the corporation as the "alter ego" of the shareholder. One such exception to the rule of non-liability involves situations where fraud or deceit has been practiced on a third party by the shareholder acting through the corporation. L.S.A.-R.S. 12:95; Dillman v. Nobles, 351 So.2d 210 (La.App. 4th Cir.1977); Bossier Millwork & Supply Company v. D. & R. Construction Company, Inc., 245 So.2d 414 (La.App. 1st Cir.1971).
Another basis for disregarding the corporate entity involves the failure to conduct a business on corporate footing, thereby disregarding the corporate entity to such an extent that the corporation ceases to be distinguishable from its shareholders. Gordon v. Baton Rouge Stores Company, 168 La. 248, 121 So. 759 (1929); Brown v. *1064 Benton Creosoting Company, 147 So.2d 89 (La.App. 2nd Cir.1962). In Louisiana, courts usually base this rule upon the often-quoted language of Keller v. Haas, 202 La. 486, 12 So.2d 238, 240 (1943):
"It is well settled that where an individual forms a corporation of which he is the sole and only stock holder or owns such control of the stock that the act of the corporation is his own, then he may not use the screen of corporate entity to absolve himself from responsibility."
The particular exception which permits application of the alter ego doctrine where corporate formalities have been disregarded is separate and distinct from that which permits its application to avoid fraud. Accord, H.Henn, Law of Corporations Section 147 (2d. ed. 1970). Factors to be considered in determining whether to apply this exception include but are not limited to "commingling of corporate and shareholder funds; failure to follow statutory formalities for incorporation and the transaction of corporate affairs; under-capitalization; failure to provide separate bank accounts and bookkeeping records; and failure to hold regular shareholder and directors meetings." Kingsman Enterprises v. Bakerfield Elec. Co., 339 So.2d 1280 (La. App. 1st Cir.1976); Smith-Hearron v. Frazier, Inc., 352 So.2d 263, 265 (La.App. 2nd Cir.1977), writ denied, 353 So.2d 1337 (La. 1978).
Whether this exception should be imposed is to be determined by the totality of the circumstances and is primarily a factual finding best made by the trier of fact. SmithHearron v. Frazier, Inc., supra; Hight Enterprises v. Smith and Johnson, Inc., 421 So.2d 267 (La.App. 4th Cir.1982), writ denied, 427 So.2d 1206 (La.1983); Liberto v. Villard, 386 So.2d 930 (La.App. 3rd Cir.1980).
In the present case, the trial court found that the totality of evidence revealed that the corporation, Dixie Shoring Company, Inc., was simply the alter ego of its major shareholder, O.P. Bajoie. Absent manifest error, the trial court's factual findings should not be reversed on appeal. Arceneaux v. Dominque, 365 So.2d 1330 (La.1978). A review of the trial transcript reveals that the trial court did not commit manifest error in its findings.
Several of the factors enumerated in Kingsman as reasons for piercing the corporate veil are evident in the present case. The trial court specifically found that no minutes of shareholder and/or directors' meetings were kept. Defendant O.P. Bajoie himself acknowledged that such records were not kept. Further, the record is replete with instances where the corporation's cash and equipment were commingled with those of O.P. Bajoie. In fact, a vehicle owned by Dixie Shoring Company, Inc. is presently being used by O.P. Bajoie in his new endeavor, Dixie Construction Company, Inc.
Plaintiffs produced at trial an advertisement run by Dixie Construction Company, Inc. in the South Central Bell Telephone Directory. This advertisement shows that defendants are utilizing the same telephone number that had been listed under the name of Dixie Shoring Company, Inc. Further, one of defendants' former employees, who now works as a subcontractor with Dixie Construction Company, Inc., testified that some of the tools and equipment he uses now while working for Dixie Construction were owned by Dixie Shoring Company, Inc.
O.P. Bajoie also testified that the corporation, Dixie Shoring, never issued stock certificates to its shareholders. Originally, when incorporated, the company had three shareholders, O.P. Bajoie with 98 shares; Julie Bajoie, 1 share; and Woodrow Walker, Bajoie's father, 1 share. After Walker's death, his share of stock was never transferred to his heir(s) or legetee(s). Julie Bajoie further testified that she was not informed nor was involved in the daily business transactions of Dixie Shoring Company, Inc.
Further, Wayne Steele, Jr. DSC's accountant for the years 1985-1986, testified that when he prepared the federal tax returns for Dixie Shoring Corporation, he determined DSC's gross receipts for each year by tallying the deposits made into the *1065 corporate accounts. Thus, any monies obtained by O.P. Bajoie and Reginald Bajoie through the cashing of checks made out to them personally and not deposited into a corporate account were not included as income of DSC.
In light of these circumstances, we can not say that the trial court erred in piercing the corporate veil of Dixie Shoring Company, Inc. and finding defendant O.P. Bajoie, its major shareholder, individually liable to the plaintiffs.
However, we can not say that the trial court was without error in holding Reginald Bajoie individually liable. The evidence reveals that Reginald Bajoie was an employee and officer of Dixie Shoring Company, Inc. He was not, at any time, a shareholder of the corporation. The purpose behind the doctrines of "piercing the corporate veil" and "alter ego" is to protect a creditor in his dealings with a shareholder who fails to distinguish, in transactions, between the corporation and his identity as a shareholder. Hight Enterprises v. Smith and Johnson, supra. Thus, these doctrines are applicable only against the shareholders of a corporation. The doctrines are not applicable to employees and/or officers who are not also shareholders in the corporation.
Plaintiffs suggest that Reginald Bajoie should be held individually liable under L.S. A.-R.S. 12:92(D), 12:93(D). The statutes provide for the individual liability of shareholders and directors when dividends or distribution of assets are made to the detriment of the corporation and/or its creditors. As stated previously, there is no evidence to suggest that Reginald Bajoie was ever a shareholder in Dixie Shoring Company, Inc. The three original shareholders in the company were O.P. Bajoie, Julie Bajoie, and Woodrow Walker (O.P. Bajoie's father). There is no documentation showing a transfer of Walker's share of stock to Reginald Bajoie or any one else upon his death. Further, O.P. Bajoie testified that he was the sole director of the corporation. As the statutes relied upon by plaintiffs place liability only upon shareholders and directors of a corporation, we must find that the statutes have no application to Reginald Bajoie. He was neither a director or shareholder of Dixie Shoring Company, Inc. Therefore, we must reverse the portion of the trial court's judgment holding Reginald Bajoie individually liable to the plaintiffs.
Defendants' third assignment of error on appeal concerns the trial court's calculation of damages. The trial court awarded plaintiffs $51,000.00 in damages for the negligent and improper levelling of their house by the defendants. After reviewing the record, we find that the trial court did not abuse its discretion in its' award for damages.
Emmett Meyer, Jr., plaintiffs' expert in civil and structural engineering, testified that the cost of repairing and resealing the cracks in the slab would be approximately $9,650.00. This estimate did not include the reshoring and levelling of the property. The repairs to the slab would have to be made after the house had been reshored and levelled. George Aldrete, an expert in shoring and mechanical engineering, estimated that it would cost plaintiffs $9,900.00 to reshore and level their house. In addition, the cracks in the interior and exterior walls, and brick veneer also need repair work. Plaintiffs' expert in general construction, Greg Kempton, testified that the cost of repairing these cracks and rebricking the house would be approximately $7,320.00. This estimate included refinishing the sheetwork, repairing the house, and the front porch, as well as rehanging the doors and replacing the bathroom tiles.
Plaintiffs also sought recovery of the monies paid to defendants for the original work performed. Mr. Riggins testified that, by the time the damage had occurred, he had paid to O.P. Bajoie $6,066.00.
To rebut plaintiffs' experts' testimony defendants' expert, Alfonse Lucien Fabre (certified as an expert in structural engineering), testified that plaintiffs' house was not damaged by the work performed by defendants. He testified that the cracks in the house were a result of soil subsidence. Mr. Fabre did not provide any estimates as to the costs of repairing the *1066 cracks and/or breaks in the slab and exterior of the house. As defendants have not assigned as an error the trial court's findings on liability, the testimony of Mr. Fabre is of no probative value in determining the amount of damages incurred by the plaintiffs. Thus, defendants have not produced any evidence to rebut plaintiffs' evidence as to the damages sustained.
Plaintiffs are also entitled to damages for mental anguish arising as a result of the damages done to the property. A plaintiff may be awarded such damages for mental anguish where the:
"... (1) property is damaged by an intentional or illegal act; (2) property is damaged by acts for which the tort feasor will be strictly or absolutely liable; (3) property is damaged by acts constituting a continuous nuisance; [or] (4) property is damaged at a time in which the owner thereof is present or situated nearby and the owner experiences trauma as a result."
First of Georgia Ins. Co. v. Cohen, 398 So.2d 1209 (La.App. 4th Cir.1981), quoting Dugas v. St. Martin Parish Police Jury, 351 So.2d 271, 276 (La.App. 3rd Cir.1977), writ denied, 353 So.2d 1046 (La.1978).
Mr. Riggins testified that he was at home the day the defendants attempted to level the house, and broke the slab. Riggins stated that he was outside watching the defendants' employees jack the house. He saw the house pull away from the jack. The whole corner of the house was raised off the ground. At that time, he heard a noise which sounded like a gun going off. Dust flew everywhere. Riggins was so distraught that he telephoned his wife at work and requested that she come home. Both Mr. and Mrs. Riggins stated that as a result of the damage to the house they were unable to sleep and were caused a great deal of inconvenience. Both plaintiffs testified that for several nights after the slab was broken, they were awakened by noises from the slab creaking and settling. Further, a number of the doors in the house have become crooked and do not close adequately. The hallway on the south end of the house is now on an incline. Carpet in one of the rooms has been taken up because of the crack in the slab. Mrs. Riggins testified that these disruptions have been very stressful. Mr. Riggins stated that he feels that they can not have guests over because the house is so disarranged from the cracking. He also testified that he feels as though the trauma is continuing. They can not even consider relocating as they are financially encumbered by the damages done to the house.
In light of this testimony, we can not say that the trial court abused its discretion in awarding plaintiffs damages in the amount of $51,000.00. The damage award is adequately supported by the evidence presented.
Accordingly, the judgment of the trial court is affirmed in part and reversed in part. The judgment of the trial court awarding plaintiffs damages in the amount of $51,000.00 and holding O.P. Bajoie individually liable is affirmed. The judgment of the trial court holding Reginald Bajoie individually liable is hereby reversed.
AFFIRMED IN PART; REVERSED IN PART.
ARMSTRONG, J., dissents with written reasons.
ARMSTRONG, Judge, dissents:
I respectfully dissent from the majority's opinion holding O.P. Bajoie personally liable.
Plaintiffs do not allege that this was an instance of fraud or deceit. Rather they contend that the corporation disregarded the corporate entity to such an extent that the individualities of the corporation and shareholder cease to exist; the corporation no longer exists as an individual distinguishable from the shareholder. When a party seeks to pierce the corporate veil, the situation must be viewed with regard to the totality of the circumstances. Liberto v. Villard, 386 So.2d 930 (La.App. 3d Cir. 1980).
Whether a corporation operates distinct and separate from its owners or simply as their "alter ego" becomes especially difficult to determine when the corporation is a *1067 small, closely-held corporation. Recognizing the beneficial aspects of corporations, courts have been liberal in their determinations; piercing the corporate veil only in "exceptional circumstances." Kingsman Enterprises v. Bakerfield Electric Co., 339 So.2d 1280 (La.App. 1st Cir.1976).
Determining the "alter ego" issue in the instant case is difficult further still because of the nature of the business. DSC is a small, family-owned, family-run shoring company. At the time of this dispute, DSC was fast becoming a casualty of our desperate economic times. Certain needs exist, such as flexibility, in the shoring business that do not necessarily exist in other types of business. Labor is hired and paid in a different way. Work is usually contingent on the weather. Cash flow for equipment and supplies is a greater priority in that line of work. These are all circumstances that must be considered in judging whether DSC's operation was conducted as a separate corporate entity.
Defendants offered explanations for their deviations from traditional corporate procedure. Both O.P. Bajoie and Reginald Bajoie explained that they requested that Riggins issue checks to them personally, rather than DSC, because they needed to have cash on hand. They stated that cash was kept in a safe at their corporate office and that employees were sometimes paid in cash. O.P. Bajoie admitted that DSC "used" his personal equipment and that its offices were housed on his property. As a majority shareholder in the business it is not unusual that he would "loan" assets to the corporation. Although there were occasional discrepancies in the corporate books concerning deposits and disbursements, the fact remains that the corporation did maintain separate accounts, did hire an accountant to keep its records and did file taxes annually. Considering the age and status of DSC, such discrepancies do not seem to represent a pattern that should categorize the corporate entity as a fiction.
An analogy can be drawn between the instant case and Harris v. Best of America Inc. 466 So.2d 1309 (La.App. 1st Cir.1985) writ denied 470 So.2d 121 (La.1985). In Harris, plaintiff argued that Blessing, the sole shareholder of Best of America, should be held solidarily liable with the corporation for its debts because Blessing's personal funds were commingled with Best's corporate funds, Best was not adequately capitalized and Best held an insufficient number of board meetings. The First Circuit observed that Blessing explained the fund transfers as loan transactions. It wrote: "Such circumstances do not demonstrate a commingling of corporate funds with the funds of the individual thereby destroying the separate identities of the entities." In regard to plaintiff's allegations of undercapitalization, the court stated: "The law specifically authorizes the establishment of a corporation by a sole stockholder and individuals are specifically authorized to assume only limited liability by setting up a minimally capitalized corporation. Cahn Elec. Appliance Co., Inc. v. Harper, 430 So.2d 143 (La.App.1983); Abraham v. Lake Forest, Inc., 377 So.2d 465 (La.App. 4th Cir.1979), writs denied 380 So.2d 99, 100 (La.1980)." Finally, the court addressed the issue of insufficient board meetings.
LSA-R.S. 12:81 discusses the role of directors in Louisiana corporations law; and there is no requisite number of meetings a corporation's board must have to maintain their corporate status ... We cannot say that two board meetings in two years is an insufficient number of meetings, which justifies piercing the corporate veil."
In conclusion the court wrote:
The totality of facts in the instant case does not support a finding that the corporation had ceased to exist as an entity, separate and distinct from its sole shareholder. Although Blessing, in his testimony, exhibited limited, if not incorrect, knowledge of the intricacies of his corporation, the evidence clearly establishes that Best operated as a legal entity distinct from its shareholder, Blessing. Best had been an active sales company for almost two years with a recognizable identity, although the contract in the instant case was Best's first attempt at construction. In fact, it is evident from *1068 the record that plaintiff was familiar with Best and never doubted he was dealing with the corporation and not Blessing personally. Further the corporation and Blessing maintained separate bank accounts. Transactions between the corporation and Blessing were documented so as to maintain the separate identity of the funds. Board meetings were conducted, one in fact specifically for obtaining authority by board resolution to enter into the construction contract with plaintiff. The totality of facts pointed out by plaintiff fails to justify the contravention of the rule of shareholder non-liability for corporation debts, and the trial judge erred in "piercing the corporate veil" and in holding Blessing solidarily liable with Best for the debt.
Just as it was the court's conclusion in Harris that the factors cited by plaintiff were not "frequent, serious, or exceptional" so as to warrant piercing the corporate veil, I conclude the same in the instant case.
NOTES
[1] As a result of the bankruptcy proceedings, all actions are stayed with regard to Dixie Shoring Company, Inc. There are no assets remaining.